# KOLSTAD *v.* AMERICAN DENTAL ASSOCIATION

No. 98–208.   Argued March 1, 1999—Decided June 22, 1999

O'CONNOR, J., delivered the opinion of the Court, Part I of which was unanimous, Part II–A of which was joined by STEVENS, SCALIA, KENNEDY, SOUTER, GINSBURG, and BREYER, JJ., and Part II–B of which was joined by REHNQUIST, C. J., and SCALIA, KENNEDY, and THOMAS, JJ. REHNQUIST, C. J., filed an opinion concurring in part and dissenting in part, in which THOMAS, J., joined, *post*, p. 547. STEVENS, J., filed an opinion concurring in part and dissenting in part, in which SOUTER, GINSBURG, and BREYER, JJ., joined, *post*, p. 547.

*Eric Schnapper* argued the cause for petitioner. With him on the briefs was *Joseph A. Yablonski.*

*Solicitor General Waxman* argued the cause for the United States et al. as *amici curiae* in support of petitioner. With him on the brief were *Acting Assistant Attorney General Lee, Deputy Solicitor General Underwood, Patricia A. Millett, Dennis J. Dimsey, Gregory B. Friel, C. Gregory Stewart, Philip B. Sklover,* and *Robert J. Gregory.*

*Raymond C. Fay* argued the cause for respondent. With him on the brief were *Stephen D. Shawe, Bruce S. Harrison,* and *Peter M. Sfikas.**

JUSTICE O'CONNOR delivered the opinion of the Court.

Under the terms of the Civil Rights Act of 1991 (1991 Act), 105 Stat. 1071, punitive damages are available in claims under Title VII of the Civil Rights Act of 1964 (Title VII), 78 Stat. 253, as amended, 42 U. S. C. § 2000e *et seq.* (1994 ed. and Supp. III), and the Americans with Disabilities Act of 1990 (ADA), 104 Stat. 328, 42 U. S. C. § 12101 *et seq.* Punitive damages are limited, however, to cases in which the em-

---

*Briefs of *amici curiae* urging reversal were filed for the Association of Trial Lawyers of America by *Jeffrey L. Needle* and *Mark S. Mandell;* for the National Employment Lawyers Association et al. by *Janice Goodman, Paula A. Brantner,* and *Peter S. Rukin;* and for the Rutherford Institute by *John W. Whitehead* and *Steven H. Aden.*

Briefs of *amici curiae* urging affirmance were filed for the Equal Employment Advisory Council by *Robert E. Williams* and *Ann Elizabeth Reesman;* for the National Retail Federation by *Robert P. Joy;* for the Society for Human Resource Management by *D. Gregory Valenza* and *Roger S. Kaplan;* and for the Washington Legal Foundation by *Michael J. Connolly, David A. Lawrence, Clifford J. Scharman, Daniel J. Popeo,* and *Paul D. Kamenar.*

Briefs of *amici curiae* were filed for the Chamber of Commerce of the United States by *Timothy B. Dyk, Daniel H. Bromberg, John B. Kennedy, Stephen A. Bokat,* and *Robin S. Conrad;* and for the Lawyers' Committee for Civil Rights Under Law et al. by *James M. Finberg, Daniel F. Kolb, Norman Redlich, Barbara R. Arnwine, Thomas J. Henderson, Richard T. Seymour, Teresa A. Ferrante, Dennis C. Hayes, Willie Abrams, Antonia Hernandez, Patricia Mendoza, Judith L. Lichtman, Donna R. Lenhoff, Judith C. Appelbaum, Martha F. Davis, Yolanda S. Wu,* and *Steven R. Shapiro.*

ployer has engaged in intentional discrimination and has done so "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." Rev. Stat. § 1977, as amended, 42 U. S. C. § 1981a(b)(1). We here consider the circumstances under which punitive damages may be awarded in an action under Title VII.

## I

## A

In September 1992, Jack O'Donnell announced that he would be retiring as the Director of Legislation and Legislative Policy and Director of the Council on Government Affairs and Federal Dental Services for respondent, American Dental Association (respondent or Association). Petitioner, Carole Kolstad, was employed with O'Donnell in respondent's Washington, D. C., office, where she was serving as respondent's Director of Federal Agency Relations. When she learned of O'Donnell's retirement, she expressed an interest in filling his position. Also interested in replacing O'Donnell was Tom Spangler, another employee in respondent's Washington office. At this time, Spangler was serving as the Association's Legislative Counsel, a position that involved him in respondent's legislative lobbying efforts. Both petitioner and Spangler had worked directly with O'Donnell, and both had received "distinguished" performance ratings by the acting head of the Washington office, Leonard Wheat.

Both petitioner and Spangler formally applied for O'Donnell's position, and Wheat requested that Dr. William Allen, then serving as respondent's Executive Director in the Association's Chicago office, make the ultimate promotion decision. After interviewing both petitioner and Spangler, Wheat recommended that Allen select Spangler for O'Donnell's post. Allen notified petitioner in December 1992 that he had, in fact, selected Spangler to serve as O'Donnell's re-

placement. Petitioner's challenge to this employment decision forms the basis of the instant action.

## B

After first exhausting her avenues for relief before the Equal Employment Opportunity Commission, petitioner filed suit against the Association in Federal District Court, alleging that respondent's decision to promote Spangler was an act of employment discrimination proscribed under Title VII. In petitioner's view, the entire selection process was a sham. Tr. 8 (Oct. 26, 1995) (closing argument for plaintiff's counsel). Counsel for petitioner urged the jury to conclude that Allen's stated reasons for selecting Spangler were pretext for gender discrimination, *id.*, at 19, 24, and that Spangler had been chosen for the position before the formal selection process began, *id.*, at 19. Among the evidence offered in support of this view, there was testimony to the effect that Allen modified the description of O'Donnell's post to track aspects of the job description used to hire Spangler. See *id.*, at 132–136 (Oct. 19, 1995) (testimony of Cindy Simms); *id.*, at 48–51 (Oct. 20, 1995) (testimony of Leonard Wheat). In petitioner's view, this "preselection" procedure suggested an intent by the Association to discriminate on the basis of sex. *Id.*, at 24. Petitioner also introduced testimony at trial that Wheat told sexually offensive jokes and that he had referred to certain prominent professional women in derogatory terms. See *id.*, at 120–124 (Oct. 18, 1995) (testimony of Carole Kolstad). Moreover, Wheat allegedly refused to meet with petitioner for several weeks regarding her interest in O'Donnell's position. See *id.*, at 112–113. Petitioner testified, in fact, that she had historically experienced difficulty gaining access to meet with Wheat. See *id.*, at 114–115. Allen, for his part, testified that he conducted informal meetings regarding O'Donnell's position with both petitioner and Spangler, see *id.*, at 148 (Oct. 23, 1995), although petitioner

stated that Allen did not discuss the position with her, see *id.*, at 127–128 (Oct. 18, 1995).

The District Court denied petitioner's request for a jury instruction on punitive damages. The jury concluded that respondent had discriminated against petitioner on the basis of sex and awarded her backpay totaling $52,718. App. 109–110. Although the District Court subsequently denied respondent's motion for judgment as a matter of law on the issue of liability, the court made clear that it had not been persuaded that respondent had selected Spangler over petitioner on the basis of sex, and the court denied petitioner's requests for reinstatement and for attorney's fees. 912 F. Supp. 13, 15 (DC 1996).

Petitioner appealed from the District Court's decisions denying her requested jury instruction on punitive damages and her request for reinstatement and attorney's fees. Respondent cross-appealed from the denial of its motion for judgment as a matter of law. In a split decision, a panel of the Court of Appeals for the District of Columbia reversed the District Court's decision denying petitioner's request for an instruction on punitive damages. 108 F. 3d 1431, 1435 (1997). In so doing, the court rejected respondent's claim that punitive damages are available under Title VII only in "'extraordinarily egregious cases.'" *Id.*, at 1437. The panel reasoned that, "because 'the state of mind necessary to trigger liability for the wrong is at least as culpable as that required to make punitive damages applicable,'" *id.*, at 1438 (quoting *Rowlett* v. *Anheuser-Busch, Inc.*, 832 F. 2d 194, 205 (CA1 1987)), the fact that the jury could reasonably have found intentional discrimination meant that the jury should have been permitted to consider punitive damages. The court noted, however, that not all cases involving intentional discrimination would support a punitive damages award. 108 F. 3d, at 1438. Such an award might be improper, the panel reasoned, in instances where the employer justifiably believes that intentional discrimination is permitted or

where an employee engages in discrimination outside the scope of that employee's authority. *Id.,* at 1438–1439. Here, the court concluded, respondent "neither attempted to justify the use of sex in its promotion decision nor disavowed the actions of its agents." *Id.,* at 1439.

The Court of Appeals subsequently agreed to rehear the case en banc, limited to the punitive damages question. In a divided opinion, the court affirmed the decision of the District Court. 139 F. 3d 958 (1998). The en banc majority concluded that, "before the question of punitive damages can go to the jury, the evidence of the defendant's culpability must exceed what is needed to show intentional discrimination." *Id.,* at 961. Based on the 1991 Act's structure and legislative history, the court determined, specifically, that a defendant must be shown to have engaged in some "egregious" misconduct before the jury is permitted to consider a request for punitive damages. *Id.,* at 965. Although the court declined to set out the "egregiousness" requirement in any detail, it concluded that petitioner failed to make the requisite showing in the instant case. Judge Randolph concurred, relying chiefly on § 1981a's structure as evidence of a congressional intent to "limi[t] punitive damages to exceptional cases." *Id.,* at 970. Judge Tatel wrote in dissent for five judges, who agreed generally with the panel majority.

We granted certiorari, 525 U. S. 960 (1998), to resolve a conflict among the Federal Courts of Appeals concerning the circumstances under which a jury may consider a request for punitive damages under § 1981a(b)(1). Compare 139 F. 3d 958 (CADC 1998) (case below), with *Luciano* v. *Olsten Corp.,* 110 F. 3d 210, 219–220 (CA2 1997) (rejecting contention that punitive damages require showing of "extraordinarily egregious" conduct).

## II

### A

Prior to 1991, only equitable relief, primarily backpay, was available to prevailing Title VII plaintiffs; the statute pro-

vided no authority for an award of punitive or compensatory damages. See *Landgraf* v. *USI Film Products*, 511 U. S. 244, 252–253 (1994). With the passage of the 1991 Act, Congress provided for additional remedies, including punitive damages, for certain classes of Title VII and ADA violations.

The 1991 Act limits compensatory and punitive damages awards, however, to cases of "intentional discrimination"— that is, cases that do not rely on the "disparate impact" theory of discrimination. 42 U. S. C. § 1981a(a)(1). Section 1981a(b)(1) further qualifies the availability of punitive awards:

> "A complaining party may recover punitive damages under this section against a respondent (other than a government, government agency or political subdivision) if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices *with malice or with reckless indifference to the federally protected rights of an aggrieved individual.*" (Emphasis added.)

The very structure of § 1981a suggests a congressional intent to authorize punitive awards in only a subset of cases involving intentional discrimination. Section 1981a(a)(1) limits compensatory and punitive awards to instances of intentional discrimination, while § 1981a(b)(1) requires plaintiffs to make an additional "demonstrat[ion]" of their eligibility for punitive damages. Congress plainly sought to impose two standards of liability—one for establishing a right to compensatory damages and another, higher standard that a plaintiff must satisfy to qualify for a punitive award.

The Court of Appeals sought to give life to this two-tiered structure by limiting punitive awards to cases involving intentional discrimination of an "egregious" nature. We credit the en banc majority's effort to effectuate congressional intent, but, in the end, we reject its conclusion that eligibility for punitive damages can only be described in

terms of an employer's "egregious" misconduct. The terms "malice" and "reckless" ultimately focus on the actor's state of mind. See, e. g., Black's Law Dictionary 956–957, 1270 (6th ed. 1990); see also W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton, Law of Torts 212–214 (5th ed. 1984) (defining "willful," "wanton," and "reckless"). While egregious misconduct is evidence of the requisite mental state, see *infra*, at 538–539; Keeton, *supra*, at 213–214, § 1981a does not limit plaintiffs to this form of evidence, and the section does not require a showing of egregious or outrageous discrimination independent of the employer's state of mind. Nor does the statute's structure imply an independent role for "egregiousness" in the face of congressional silence. On the contrary, the view that § 1981a provides for punitive awards based solely on an employer's state of mind is consistent with the 1991 Act's distinction between equitable and compensatory relief. Intent determines which remedies are open to a plaintiff here as well; compensatory awards are available only where the employer has engaged in *"intentional* discrimination." § 1981a(a)(1) (emphasis added).

Moreover, § 1981a's focus on the employer's state of mind gives some effect to Congress' apparent intent to narrow the class of cases for which punitive awards are available to a subset of those involving intentional discrimination. The employer must act with "malice or with reckless indifference *to the [plaintiff's] federally protected rights."* § 1981a(b)(1) (emphasis added). The terms "malice" or "reckless indifference" pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination.

We gain an understanding of the meaning of the terms "malice" and "reckless indifference," as used in § 1981a, from this Court's decision in *Smith* v. *Wade,* 461 U. S. 30 (1983). The parties, as well as both the en banc majority and dissent, recognize that Congress looked to the Court's decision in *Smith* in adopting this language in § 1981a. See Tr. of Oral

Arg. 28–29; Brief for Petitioner 24; 139 F. 3d, at 964–965; *id.*, at 971 (Tatel, J., dissenting). Employing language similar to what later appeared in § 1981a, the Court concluded in *Smith* that "a jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." 461 U. S., at 56. While the *Smith* Court determined that it was unnecessary to show actual malice to qualify for a punitive award, *id.*, at 45–48, its intent standard, at a minimum, required recklessness in its subjective form. The Court referred to a "subjective consciousness" of a risk of injury or illegality and a "'criminal indifference to civil obligations.'" *Id.*, at 37, n. 6, 41 (quoting *Philadelphia, W. & B. R. Co.* v. *Quigley*, 21 How. 202, 214 (1859)); see also *Farmer* v. *Brennan*, 511 U. S. 825, 837 (1994) (explaining that criminal law employs a subjective form of recklessness, requiring a finding that the defendant "disregards a risk of harm of which he is aware"); see generally 1 T. Sedgwick, Measure of Damages §§ 366, 368, pp. 528, 529 (8th ed. 1891) (describing "wantonness" in punitive damages context in terms of "criminal indifference" and "gross negligence" in terms of a "conscious indifference to consequences"). The Court thus compared the recklessness standard to the requirement that defendants act with "'knowledge of falsity or reckless disregard for the truth'" before punitive awards are available in defamation actions, *Smith, supra*, at 50 (quoting *Gertz* v. *Robert Welch, Inc.*, 418 U. S. 323, 349 (1974)), a subjective standard, *Harte-Hanks Communications, Inc.* v. *Connaughton*, 491 U. S. 657, 688 (1989). Applying this standard in the context of § 1981a, an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages.

There will be circumstances where intentional discrimination does not give rise to punitive damages liability under this standard. In some instances, the employer may simply

be unaware of the relevant federal prohibition. There will be cases, moreover, in which the employer discriminates with the distinct belief that its discrimination is lawful. The underlying theory of discrimination may be novel or otherwise poorly recognized, or an employer may reasonably believe that its discrimination satisfies a bona fide occupational qualification defense or other statutory exception to liability. See, e. g., 42 U. S. C. § 2000e–2(e)(1) (setting out Title VII defense "where religion, sex, or national origin is a bona fide occupational qualification"); see also § 12113 (setting out defenses under ADA). In *Hazen Paper Co.* v. *Biggins,* 507 U. S. 604, 616 (1993), we thus observed that, in light of statutory defenses and other exceptions permitting age-based decisionmaking, an employer may knowingly rely on age to make employment decisions without recklessly violating the Age Discrimination in Employment Act of 1967 (ADEA). Accordingly, we determined that limiting liquidated damages under the ADEA to cases where the employer "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute," without an additional showing of outrageous conduct, was sufficient to give effect to the ADEA's two-tiered liability scheme. *Id.,* at 616, 617.

At oral argument, respondent urged that the common law tradition surrounding punitive awards includes an "egregious misconduct" requirement. See, e. g., Tr. of Oral Arg. 26–28; see also Brief for Chamber of Commerce of the United States as *Amicus Curiae* 8–22 (advancing this argument). We assume that Congress, in legislating on punitive awards, imported common law principles governing this form of relief. See, e. g., *Molzof* v. *United States,* 502 U. S. 301, 307 (1992). Moreover, some courts and commentators have described punitive awards as requiring both a specified state of mind and egregious or aggravated misconduct. See, e. g., 1 D. Dobbs, Law of Remedies 468 (2d ed. 1993) ("Punitive damages are awarded when the defendant is guilty of both a bad state of mind and highly serious misconduct").

Most often, however, eligibility for punitive awards is characterized in terms of a defendant's motive or intent. See, *e. g.*, 1 Sedgwick, *supra*, at 526, 528; C. McCormick, Law of Damages 280 (1935). Indeed, "[t]he justification of exemplary damages lies in the evil intent of the defendant." 1 Sedgwick, *supra*, at 526; see also 2 J. Sutherland, Law of Damages § 390, p. 1079 (3d ed. 1903) (discussing punitive damages under rubric of "[c]ompensation for wrongs done with bad motive"). Accordingly, "a positive element of conscious wrongdoing is always required." McCormick, *supra*, at 280.

Egregious misconduct is often associated with the award of punitive damages, but the reprehensible character of the conduct is not generally considered apart from the requisite state of mind. Conduct warranting punitive awards has been characterized as "egregious," for example, *because* of the defendant's mental state. See Restatement (Second) of Torts § 908(2) (1979) ("Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others"). Respondent, in fact, appears to endorse this characterization. See, *e. g.*, Brief for Respondent 19 ("Malicious and reckless conduct [is] by definition egregious"); see also *id.*, at 28–29. That conduct committed with the specified mental state may be characterized as egregious, however, is not to say that employers must engage in conduct with some independent, "egregious" quality before being subject to a punitive award.

To be sure, egregious or outrageous acts may serve as evidence supporting an inference of the requisite "evil motive." "The allowance of exemplary damages depends upon the bad motive of the wrong-doer *as exhibited by his acts.*" 1 Sedgwick, *supra*, at 529 (emphasis added); see also 2 Sutherland, *supra*, § 394, at 1101 ("The spirit which actuated the wrong-doer may doubtless be inferred from the circumstances surrounding the parties and the transaction"); see, *e. g.*, *Chizmar* v. *Mackie*, 896 P. 2d 196, 210 (Alaska 1995)

("[W]here there is no evidence that gives rise to an inference of actual malice or conduct sufficiently outrageous to be deemed equivalent to actual malice, the trial court need not, and indeed should not, submit the issue of punitive damages to the jury" (internal quotation marks omitted)); *Horton* v. *Union Light, Heat & Power Co.*, 690 S. W. 2d 382, 389 (Ky. 1985) (observing that "malice . . . may be implied from outrageous conduct"). Likewise, under § 1981a(b)(1), pointing to evidence of an employer's egregious behavior would provide one means of satisfying the plaintiff's burden to "demonstrat[e]" that the employer acted with the requisite "malice or . . . reckless indifference." See 42 U. S. C. § 1981a(b)(1); see, *e. g.*, 3 BNA EEOC Compliance Manual N:6085–N6084 (1992) (Enforcement Guidance: Compensatory and Punitive Damages Available Under § 102 of the Civil Rights Act of 1991) (listing "[t]he degree of egregiousness and nature of the respondent's conduct" among evidence tending to show malice or reckless disregard). Again, however, respondent has not shown that the terms "reckless indifference" and "malice," in the punitive damages context, have taken on a consistent definition including an independent, "egregiousness" requirement. Cf. *Morissette* v. *United States*, 342 U. S. 246, 263 (1952) ("[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed").

## B

The inquiry does not end with a showing of the requisite "malice or . . . reckless indifference" on the part of certain individuals, however. 42 U. S. C. § 1981a(b)(1). The plaintiff must impute liability for punitive damages to respondent. The en banc dissent recognized that agency principles place limits on vicarious liability for punitive damages. 139 F. 3d,

at 974 (Tatel, J., dissenting). Likewise, the Solicitor General as *amicus* acknowledged during argument that common law limitations on a principal's liability in punitive awards for the acts of its agents apply in the Title VII context. Tr. of Oral Arg. 23.

JUSTICE STEVENS urges that we should not consider these limitations here. See *post*, at 552–553 (opinion concurring in part and dissenting in part). While we decline to engage in any definitive application of the agency standards to the facts of this case, see *infra*, at 546, it is important that we address the proper legal standards for imputing liability to an employer in the punitive damages context. This issue is intimately bound up with the preceding discussion on the evidentiary showing necessary to qualify for a punitive award, and it is easily subsumed within the question on which we granted certiorari—namely, "[i]n what circumstances may punitive damages be awarded under Title VII of the 1964 Civil Rights Act, as amended, for unlawful intentional discrimination?" Pet. for Cert. i; see also this Court's Rule 14.1(a). "On a number of occasions, this Court has considered issues waived by the parties below and in the petition for certiorari because the issues were so integral to decision of the case that they could be considered 'fairly subsumed' by the actual questions presented." *Gilmer* v. *Interstate/ Johnson Lane Corp.*, 500 U. S. 20, 37 (1991) (STEVENS, J., dissenting) (citing cases). The Court has not always confined itself to the set of issues addressed by the parties. See, *e. g., Steel Co.* v. *Citizens for Better Environment*, 523 U. S. 83, 93–102, and n. 1 (1998); *H. J. Inc.* v. *Northwestern Bell Telephone Co.*, 492 U. S. 229, 243–249 (1989); *Continental Ill. Nat. Bank & Trust Co.* v. *Chicago R. I. & P. R. Co.*, 294 U. S. 648, 667–675 (1935). Here, moreover, limitations on the extent to which principals may be liable in punitive damages for the torts of their agents was the subject of discussion by both the en banc majority and dissent, see 139 F. 3d, at 968; *id.*, at 974 (Tatel, J., dissenting), *amicus*

briefing, see Brief for Chamber of Commerce of the United States as *Amicus Curiae* 22–27, and substantial questioning at oral argument, see Tr. of Oral Arg. 11–17, 19–24, 49–50, 54–55. Nor did respondent discount the notion that agency principles may place limits on an employer's vicarious liability for punitive damages. See *post*, at 552. In fact, respondent advanced the general position "that the higher agency principles, under common law, would apply to punitive damages." Tr. of Oral Arg. 49. Accordingly, we conclude that these potential limitations on the extent of respondent's liability are properly considered in the instant case.

The common law has long recognized that agency principles limit vicarious liability for punitive awards. See, *e. g.*, G. Field, Law of Damages §§ 85–87 (1876); 1 Sedgwick, Damages § 378; McCormick, Damages § 80; 2 F. Mechem, Law of Agency §§ 2014–2015 (2d ed. 1914). This is a principle, moreover, that this Court historically has endorsed. See, *e. g.*, *Lake Shore & Michigan Southern R. Co.* v. *Prentice*, 147 U. S. 101, 114–115 (1893); *The Amiable Nancy*, 3 Wheat. 546, 558–559 (1818). Courts of Appeals, too, have relied on these liability limits in interpreting 42 U. S. C. § 1981a. See, *e. g.*, *Dudley* v. *Wal-Mart Stores, Inc.*, 166 F. 3d 1317, 1322–1323 (CA11 1999); *Harris* v. *L & L Wings, Inc.*, 132 F. 3d 978, 983–985 (CA4 1997). See also *Fitzgerald* v. *Mountain States Telephone & Telegraph Co.*, 68 F. 3d 1257, 1263–1264 (CA10 1995) (same in suit under 42 U. S. C. § 1981). But see *Deffenbaugh-Williams* v. *Wal-Mart Stores, Inc.*, 156 F. 3d 581, 592–594 (CA5 1998), rehearing en banc ordered, 169 F. 3d 215 (1999).

We have observed that, "[i]n express terms, Congress has directed federal courts to interpret Title VII based on agency principles." *Burlington Industries, Inc.* v. *Ellerth*, 524 U. S. 742, 754 (1998); see also *Meritor Savings Bank, FSB* v. *Vinson*, 477 U. S. 57, 72 (1986) (noting that, in interpreting Title VII, "Congress wanted courts to look to agency principles for guidance"). Observing the limits on liability

that these principles impose is especially important when interpreting the 1991 Act. In promulgating the Act, Congress conspicuously left intact the "limits of employer liability" established in *Meritor. Faragher* v. *Boca Raton,* 524 U. S. 775, 804, n. 4 (1998); see also *Burlington Industries, Inc., supra,* at 763–764 ("[W]e are bound by our holding in *Meritor* that agency principles constrain the imposition of vicarious liability in cases of supervisory harassment").

Although jurisdictions disagree over whether and how to limit vicarious liability for punitive damages, see, *e. g.,* 2 J. Ghiardi & J. Kircher, Punitive Damages: Law and Practice § 24.01 (1998) (discussing disagreement); 22 Am. Jur. 2d, Damages § 788 (1988) (same), our interpretation of Title VII is informed by "the general common law of agency, rather than . . . the law of any particular State." *Burlington Industries, Inc., supra,* at 754 (internal quotation marks omitted). The common law as codified in the Restatement (Second) of Agency (1957), provides a useful starting point for defining this general common law. See *Burlington Industries, Inc., supra,* at 755 ("[T]he Restatement . . . is a useful beginning point for a discussion of general agency principles"); see also *Meritor, supra,* at 72. The Restatement of Agency places strict limits on the extent to which an agent's misconduct may be imputed to the principal for purposes of awarding punitive damages:

> "Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if:
> "(a) the principal authorized the doing and the manner of the act, or
> "(b) the agent was unfit and the principal was reckless in employing him, or
> "(c) the agent was employed in a managerial capacity and was acting in the scope of employment, or

"(d) the principal or a managerial agent of the principal ratified or approved the act." Restatement (Second) of Agency, *supra,* §217 C.

See also Restatement (Second) of Torts §909 (same).

The Restatement, for example, provides that the principal may be liable for punitive damages if it authorizes or ratifies the agent's tortious act, or if it acts recklessly in employing the malfeasing agent. The Restatement also contemplates liability for punitive awards where an employee serving in a "managerial capacity" committed the wrong while "acting in the scope of employment." Restatement (Second) of Agency, *supra,* §217 C; see also Restatement (Second) of Torts, *supra,* §909 (same). "Unfortunately, no good definition of what constitutes a 'managerial capacity' has been found," 2 Ghiardi, Punitive Damages, §24.05, at 14, and determining whether an employee meets this description requires a fact-intensive inquiry, *id.,* §24.05; 1 L. Schlueter & K. Redden, Punitive Damages, §4.4(B)(2)(a), p. 181 (3d ed. 1995). "In making this determination, the court should review the type of authority that the employer has given to the employee, the amount of discretion that the employee has in what is done and how it is accomplished." *Id.,* §4.4(B)(2)(a), at 181. Suffice it to say here that the examples provided in the Restatement of Torts suggest that an employee must be "important," but perhaps need not be the employer's "top management, officers, or directors," to be acting "in a managerial capacity." *Ibid.;* see also 2 Ghiardi, *supra,* §24.05, at 14; Restatement (Second) of Torts, *supra,* §909, at 468, Comment *b* and Illus. 3.

Additional questions arise from the meaning of the "scope of employment" requirement. The Restatement of Agency provides that even intentional torts are within the scope of an agent's employment if the conduct is "the kind [the employee] is employed to perform," "occurs substantially within the authorized time and space limits," and "is actuated, at least in part, by a purpose to serve the" employer. Restate-

ment (Second) of Agency, § 228(1), at 504. According to the Restatement, so long as these rules are satisfied, an employee may be said to act within the scope of employment even if the employee engages in acts "specifically forbidden" by the employer and uses "forbidden means of accomplishing results." *Id.*, § 230, at 511, Comment *b;* see also *Burlington Industries, Inc.*, 524 U. S., at 756; Keeton, Torts § 70. On this view, even an employer who makes every effort to comply with Title VII would be held liable for the discriminatory acts of agents acting in a "managerial capacity."

Holding employers liable for punitive damages when they engage in good faith efforts to comply with Title VII, however, is in some tension with the very principles underlying common law limitations on vicarious liability for punitive damages—that it is "improper ordinarily to award punitive damages against one who himself is personally innocent and therefore liable only vicariously." Restatement (Second) of Torts, *supra*, § 909, at 468, Comment *b.* Where an employer has undertaken such good faith efforts at Title VII compliance, it "demonstrat[es] that it never acted in reckless disregard of federally protected rights." 139 F. 3d, at 974 (Tatel, J., dissenting); see also *Harris*, 132 F. 3d, at 983, 984 (observing that, "[i]n some cases, the existence of a written policy instituted in good faith has operated as a total bar to employer liability for punitive damages" and concluding that "the institution of a written sexual harassment policy goes a long way towards dispelling any claim about the employer's 'reckless' or 'malicious' state of mind").

Applying the Restatement of Agency's "scope of employment" rule in the Title VII punitive damages context, moreover, would reduce the incentive for employers to implement antidiscrimination programs. In fact, such a rule would likely exacerbate concerns among employers that § 1981a's "malice" and "reckless indifference" standard penalizes those employers who educate themselves and their employees on Title VII's prohibitions. See Brief for Equal Employment

Advisory Council as *Amicus Curiae* 12 ("[I]f an employer has made efforts to familiarize itself with Title VII's require-ments, then any violation of those requirements by the employer can be inferred to have been committed 'with mal-ice or with reckless indifference'"). Dissuading employers from implementing programs or policies to prevent discrimi-nation in the workplace is directly contrary to the purposes underlying Title VII. The statute's "primary objective" is "a prophylactic one," *Albemarle Paper Co.* v. *Moody,* 422 U. S. 405, 417 (1975); it aims, chiefly, "not to provide redress but to avoid harm," *Faragher,* 524 U. S., at 806. With re-gard to sexual harassment, "[f]or example, Title VII is de-signed to encourage the creation of antiharassment policies and effective grievance mechanisms." *Burlington Indus-tries, Inc.,* 524 U. S., at 764. The purposes underlying Title VII are similarly advanced where employers are encouraged to adopt antidiscrimination policies and to educate their per-sonnel on Title VII's prohibitions.

In light of the perverse incentives that the Restatement's "scope of employment" rules create, we are compelled to modify these principles to avoid undermining the objectives underlying Title VII. See generally *ibid.* See also *Fara-gher, supra,* at 802, n. 3 (noting that Court must "adapt agency concepts to the practical objectives of Title VII"); *Meritor Savings Bank, FSB,* 477 U. S., at 72 ("[C]ommon-law principles may not be transferable in all their particulars to Title VII"). Recognizing Title VII as an effort to pro-mote prevention as well as remediation, and observing the very principles underlying the Restatements' strict limits on vicarious liability for punitive damages, we agree that, in the punitive damages context, an employer may not be vicari-ously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's "good-faith efforts to comply with Title VII." 139 F. 3d, at 974 (Tatel, J., dissenting). As the dissent recog-nized, "[g]iving punitive damages protection to employers

who make good-faith efforts to prevent discrimination in the workplace accomplishes" Title VII's objective of "motivat-[ing] employers to detect and deter Title VII violations." *Ibid.*

We have concluded that an employer's conduct need not be independently "egregious" to satisfy § 1981a's requirements for a punitive damages award, although evidence of egregious misconduct may be used to meet the plaintiff's burden of proof. We leave for remand the question whether petitioner can identify facts sufficient to support an inference that the requisite mental state can be imputed to respondent. The parties have not yet had an opportunity to marshal the record evidence in support of their views on the application of agency principles in the instant case, and the en banc majority had no reason to resolve the issue because it concluded that petitioner had failed to demonstrate the requisite "egregious" misconduct. 139 F. 3d, at 968. Although trial testimony established that Allen made the ultimate decision to promote Spangler while serving as petitioner's interim executive director, respondent's highest position, Tr. 159 (Oct. 19, 1995), it remains to be seen whether petitioner can make a sufficient showing that Allen acted with malice or reckless indifference to petitioner's Title VII rights. Even if it could be established that Wheat effectively selected O'Donnell's replacement, moreover, several questions would remain, *e. g.*, whether Wheat was serving in a "managerial capacity" and whether he behaved with malice or reckless indifference to petitioner's rights. It may also be necessary to determine whether the Association had been making good faith efforts to enforce an antidiscrimination policy. We leave these issues for resolution on remand.

For the foregoing reasons, the judgment of the Court of Appeals is vacated, and the case is remanded for proceedings consistent with this opinion.

*It is so ordered.*

CHIEF JUSTICE REHNQUIST, with whom JUSTICE THOMAS joins, concurring in part and dissenting in part.

For the reasons stated by Judge Randolph in his concurring opinion in the Court of Appeals, I would hold that Congress' two-tiered scheme of Title VII monetary liability implies that there is an egregiousness requirement that reserves punitive damages only for the worst cases of intentional discrimination. See 139 F. 3d 958, 970 (CADC 1998). Since the Court has determined otherwise, however, I join Part I and that portion of Part II–B of the Court's opinion holding that principles of agency law place a significant limitation, and in many foreseeable cases a complete bar, on employer liability for punitive damages.

JUSTICE STEVENS, with whom JUSTICE SOUTER, JUSTICE GINSBURG, and JUSTICE BREYER join, concurring in part and dissenting in part.

The Court properly rejects the Court of Appeals' holding that defendants in Title VII actions must engage in "egregious" misconduct before a jury may be permitted to consider a request for punitive damages. Accordingly, I join Parts I and II–A of its opinion. I write separately, however, because I strongly disagree with the Court's decision to volunteer commentary on an issue that the parties have not briefed and that the facts of this case do not present. I would simply remand for a trial on punitive damages.

I

In enacting the Civil Rights Act of 1991 (1991 Act), Congress established a three-tiered system of remedies for a broad range of discriminatory conduct, including violations of Title VII of the Civil Rights Act of 1964, 42 U. S. C. § 2000e *et seq.*, as well as some violations of the Americans with Disabilities Act of 1990 (ADA), 42 U. S. C. § 12101 *et seq.* (1994 ed. and Supp. III). Equitable remedies are available

548

for disparate impact violations; compensatory damages for intentional disparate treatment; and punitive damages for intentional discrimination "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." § 1981a(b)(1).

The 1991 Act's punitive damages standard, as the Court recognizes, *ante*, at 535–536, is quite obviously drawn from our holding in *Smith* v. *Wade*, 461 U. S. 30 (1983). There, we held that punitive damages may be awarded under 42 U. S. C. § 1983 (1976 ed., Supp. V) "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." 461 U. S., at 56.* The 1991 Act's standard is also the same intent-based standard used in the Age Discrimination in Employment Act of 1967 (ADEA), 29 U. S. C. § 621 *et seq.* (1994 ed. and Supp. III). The ADEA provides for an award of liquidated damages— damages that are "punitive in nature," *Trans World Airlines, Inc.* v. *Thurston,* 469 U. S. 111, 125 (1985)—when the employer "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *Hazen Paper Co.* v. *Biggins,* 507 U. S. 604, 617 (1993); accord, *Thurston,* 469 U. S., at 126.

---

*Lest there be any doubt that Congress looked to *Smith* in crafting the statute, the Report of the House Judiciary Committee explains that the "standard for punitive damages is taken directly from civil rights case law," H. R. Rep. No. 102–40, pt. 2, p. 29 (1991), and proceeds to quote and cite with approval the very page in *Smith* that announced the punitive damages standard requiring "evil motive or intent, or . . . reckless or callous indifference to the federally protected rights of others," 461 U. S., at 56, quoted in H. R. Rep. No. 102–40, at 29. The Report of the House Education and Labor Committee echoed this sentiment. See H. R. Rep. No. 102–40, p. 74 (1991) (citing *Smith* with approval). Congress' substitution in the 1991 Act of the word "malice" for *Smith's* phrase "evil motive or intent" is inconsequential; in *Smith,* we noted that "malice . . . may be an appropriate" term to denote ill will or an intent to injure. See 461 U. S., at 37, n. 6.

In *Smith*, we carefully noted that our punitive damages standard separated the "quite distinct concepts of *intent to cause* injury, on one hand, and *subjective consciousness* of risk of injury (or of unlawfulness) on the other," 461 U. S., at 38, n. 6, and held that punitive damages are permissible only when the latter component is satisfied by a deliberate or recklessly indifferent violation of federal law. In *Thurston*, we interpreted the ADEA's standard the same way and explained that the relevant mental distinction between intentional discrimination and "reckless disregard" for federally protected rights is essentially the same as the well-known difference between a "knowing" and a "willful" violation of a criminal law. See 469 U. S., at 126–127. While a criminal defendant, like an employer, need not have knowledge of the law to act "knowingly" or intentionally, he must know that his acts violate the law or must "careless[ly] disregard whether or not one has the right so to act" in order to act "willfully." *United States* v. *Murdock*, 290 U. S. 389, 395 (1933), quoted in *Thurston*, 469 U. S., at 127. We have interpreted the word "willfully" the same way in the civil context. See *McLaughlin* v. *Richland Shoe Co.*, 486 U. S. 128, 133 (1988) (holding that the "plain language" of the Fair Labor Standards Act's "willful" liquidated damages standard requires that "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute," without regard to the outrageousness of the conduct at issue).

Construing § 1981a(b)(1) to impose a purely mental standard is perfectly consistent with the structure and purpose of the 1991 Act. As with the ADEA, the 1991 Act's "willful" or "reckless disregard" standard respects the Act's "two-tiered" damages scheme while deterring future intentionally unlawful discrimination. See *Hazen Paper*, 507 U. S., at 614–615. There are, for reasons the Court explains, see *ante*, at 536–537, numerous instances in which an employer might intentionally treat an individual differently because of her race,

gender, religion, or disability without knowing that it is violating Title VII or the ADA. In order to recover compensatory damages under the 1991 Act, victims of unlawful disparate treatment must prove that the defendants' *conduct* was intentional, but they need not prove that the defendants either knew or should have known that they were *violating the law*. It is the additional element of willful or reckless disregard of the law that justifies a penalty of double damages in age discrimination cases and punitive damages in the broad range of cases covered by the 1991 Act.

It is of course true that as our society moves closer to the goal of eliminating intentional, invidious discrimination, the core mandates of Title VII and the ADA are becoming increasingly ingrained in employers' minds. As more employers come to appreciate the importance and the proportions of those statutes' mandates, the number of federal violations will continue to decrease accordingly. But at the same time, one could reasonably believe, as Congress did, that as our national resolve against employment discrimination hardens, deliberate violations of Title VII and the ADA become increasingly blameworthy and more properly the subject of "societal condemnation," *McKennon* v. *Nashville Banner Publishing Co.*, 513 U. S. 352, 357 (1995), in the form of punitive damages. Indeed, it would have been rather perverse for Congress to conclude that the increasing acceptance of antidiscrimination laws in the workplace somehow mitigates willful violations of those laws such that only those violations that are accompanied by particularly outlandish acts warrant special deterrence.

Given the clarity of our cases and the precision of Congress' words, the common-law tradition of punitive damages and any relationship it has to "egregious conduct" is quite irrelevant. It is enough to say that Congress provided in the 1991 Act its own punitive damages standard that focuses solely on willful mental state, and it did not suggest that there is any class of willful violations that are exempt from

exposure to punitive damages. Nor did it indicate that there is a point on the spectrum of deliberate or recklessly indifferent conduct that qualifies as "egregious." Thus, while behavior that merits that opprobrious label may provide probative evidence of wrongful motive, it is not a necessary prerequisite to proving such a motive under the 1991 Act. To the extent that any treatise or federal, state, or "common-law" case might suggest otherwise, it is wrong.

There are other means of proving that an employer willfully violated the law. An employer, may, for example, express hostility toward employment discrimination laws or conceal evidence regarding its "true" selection procedures because it knows they violate federal law. Whatever the case, so long as a Title VII plaintiff proffers sufficient evidence from which a jury could conclude that an employer acted willfully, judges have no place making their own value judgments regarding whether the conduct was "egregious" or otherwise presents an inappropriate candidate for punitive damages; the issue must go to the jury.

If we accept the jury's appraisal of the evidence in this case and draw, as we must when reviewing the denial of a jury instruction, all reasonable inferences in petitioner's favor, there is ample evidence from which the jury could have concluded that respondent willfully violated Title VII. Petitioner emphasized, at trial and in her briefs to this Court, that respondent took "a tangible employment action" against her in the form of denying a promotion. Brief for Petitioner 47. Evidence indicated that petitioner was the more qualified of the two candidates for the job. Respondent's decisionmakers, who were senior executives of the Association, were known occasionally to tell sexually offensive jokes and referred to professional women in derogatory terms. The record further supports an inference that these executives not only deliberately refused to consider petitioner fairly and to promote her because she is a woman, but manipulated the job requirements and conducted a

"sham" selection procedure in an attempt to conceal their misconduct.

There is no claim that respondent's decisionmakers violated any company policy; that they were not acting within the scope of their employment; or that respondent has ever disavowed their conduct. Neither respondent nor its two decisionmakers claimed at trial any ignorance of Title VII's requirements, nor did either offer any "good-faith" reason for believing that being a man was a legitimate requirement for the job. Rather, at trial respondent resorted to false, pretextual explanations for its refusal to promote petitioner.

The record, in sum, contains evidence from which a jury might find that respondent acted with reckless indifference to petitioner's federally protected rights. It follows, in my judgment, that the three-judge panel of the Court of Appeals correctly decided to remand the case to the District Court for a trial on punitive damages. See 108 F. 3d 1431, 1440 (CADC 1997). To the extent that the Court's opinion fails to direct that disposition, I respectfully dissent.

## II

In Part II–B of its opinion, the Court discusses the question whether "[t]he plaintiff must impute liability for punitive damages to respondent" under "agency principles." *Ante*, at 539. That is a question that neither of the parties has ever addressed in this litigation and that respondent, at least, has expressly disavowed. When prodded at oral argument, counsel for respondent twice stood firm on this point. "[W]e all agree," he twice repeated, "that that precise issue is not before the Court." Tr. of Oral Arg. 49. Nor did any of the 11 judges in the Court of Appeals believe that it was applicable to the dispute at hand—presumably because promotion decisions are quintessential "company acts," see 139 F. 3d 958, 968 (CADC 1998), and because the two executives who made this promotion decision were the executive direc-

tor of the Association and the acting head of its Washington office. *Id.*, at 974, 979 (Tatel, J., dissenting). See also 108 F. 3d, at 1434, 1439. Judge Tatel, who the Court implies raised the agency issue, in fact explicitly (and correctly) concluded that "[t]his case does not present these or analogous circumstances." 108 F. 3d, at 1439.

The absence of briefing or meaningful argument by the parties makes this Court's gratuitous decision to volunteer an opinion on this nonissue particularly ill advised. It is not this Court's practice to consider arguments—specifically, alternative defenses of the judgment under review—that were not presented in the brief in opposition to the petition for certiorari. See this Court's Rule 15.2. Indeed, on two occasions in this very Term, we refused to do so despite the fact that the issues were briefed and argued by the parties. See *South Central Bell Telephone Co.* v. *Alabama*, 526 U. S. 160, 171 (1999); *Roberts* v. *Galen of Va., Inc.*, 525 U. S. 249, 253–254 (1999) *(per curiam)*. If we declined to reach alternative defenses under those circumstances, surely we should do so here.

Nor is it accurate for the Court to imply that the Solicitor General, representing Government *amici*, advocates a course similar to that which the Court takes regarding the agency question. Cf. *ante*, at 540. The Solicitor General, like the parties, did not brief any agency issue. At oral argument, he correspondingly stated that the issue "is not really presented here." Tr. of Oral Arg. 19. He then responded to the Court's questions by stating that the Federal Government believes that whenever a tangible employment consequence is involved § 1981a incorporates the "managerial capacity" principles espoused by § 217 C of the Restatement (Second) of Agency. See Tr. of Oral Arg. 23. But to the extent that the Court tinkers with the Restatement's standard, it is rejecting the Government's view of its own statute without giving it an opportunity to be heard on the issue.

Accordingly, while I agree with the Court's rejection of the en banc majority's holding on the only issue that it confronted, I respectfully dissent from the Court's failure to order a remand for trial on the punitive damages issue.