JONES, Chief District Judge, concurring in part and dissenting in part:
I join with Judge Duncan in affirming the district court’s refusal to instruct the jury based on Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277 (4th Cir.2004), its denial of a Rule 50(b) motion on the plaintiffs § 1981 claim, and its evi-dentiary rulings. However, I would also affirm the district court’s refusal to set aside the jury’s punitive damage award.[1]
The majority finds that there was insufficient evidence to support an award of punitive damages as to the § 1981 claim. To the contrary, I believe that there was ample evidence that DynCorp International, LLC (“DynCorp”) terminated the subcontract it entered into with Worldwide Network Services, Inc. (“WWNS”) to provide communication and information-technology services for the U.S. State Department’s Civilian Police programs in Iraq and Afghanistan (“CivPol Subcontract”) in the face of knowledge that “it may be acting in violation of federal law.” Kolstad v. Am. Dental Ass’n, 527 U.S. 526, 535, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999).
Indeed, DynCorp was warned by WWNS that ending the CivPol Subcontract might violate WWNS’s federally pro *458 tected rights. On July 26, 2006, WWNS sent DynCorp’s in-house counsel a letter, via e-mail and overnight mail, demanding that DynCorp immediately “comply with its obligations under the” CivPol Subcontract and informing DynCorp that WWNS had “evidence that DynCorp’s actions have been racially-motivated in violation of federal anti-discrimination laws.” (J.A. 2692.) The evidence also shows that the executives who made the decision to terminate the CivPol Subcontract were aware of the contents of this letter. On July 26, 2006, WWNS Chairman and CEO, Walter Gray, wrote two of DynCorp’s decisionmakers, Richard Cashon and Robert Rosenkranz— as well as Herb Lanese, the CEO of Dyn-Corp — to confirm that DynCorp’s in-house counsel received the letter “regarding [DynCorp’s] wrongful and improper conduct in terminating [WWNS’s] services under the CivPol subcontract.” (J.A. 2694.) Richard Walsh, Division Vice-President of Operations for DynCorp, later e-mailed an internal PowerPoint presentation to other DynCorp executives including Cashon, outlining the eventual termination of the CivPol Subcontract. One of the slides of the presentation stated that “[r]ecent correspondence indicate[s] that WWNS is planning legal action against [DynCorp] based on racial discrimination.” (J.A. 2788.)
Comparing this case to Anderson v. G.D.C., Inc., 281 F.3d 452 (4th Cir.2002), it is clear a jury could reasonably conclude from the July 26 letter that DynCorp’s decisionmakers discriminated against WWNS “in the face of a perceived risk that its actions will violate federal law.” Kolstad, 527 U.S. at 536, 119 S.Ct. 2118. In Anderson, one of the defendant’s employees was found to have sexually harassed the plaintiff in violation of Title VII, a federal law prohibiting discrimination on the basis of sex. 281 F.3d at 458-59. The only evidence presented that the employee knew of the Title VII prohibition was that he looked at, but did not read, a poster entitled “Sexual Harassment,” advising employees of proper workplace conduct. Id. at 460. Nevertheless, this court found that the employee’s mere “awareness” of the poster “suggested at least a rudimentary knowledge of its import” sufficient to pass the Kolstad test. Id.
Here, the DynCorp decisionmakers were directly warned, and even anticipating, that they would have to confront litigation for racial discrimination if they continued to pursue the termination of the CivPol Subcontract. Their level of awareness of WWNS’s federally protected rights was therefore well beyond that of the employee in Anderson who at most saw the title of a poster on a wall.
DynCorp argues that, even if the July 26 letter did put the decisionmakers on notice, it came too late to avoid violating § 1981, but I find little merit to this argument. The letter was sent well before WWNS had ceased operations under the CivPol Subcontract in either Iraq or Afghanistan. Not only were the task orders under the CivPol Subcontract still in effect, but DynCorp had not yet notified WWNS of its intention to let any of the task orders expire.
The task order in Iraq was not scheduled to end until August 11, 2006. Although DynCorp formally informed WWNS in a letter dated July 28, 2006, that DynCorp intended to let the personnel portion of this task order expire, Dyn-Corp also extended its purchase of services from WWNS in Iraq another thirty days.
Moreover, the four task orders in Afghanistan continued until August 31, September 8, September 30, and October 9, 2006, months after WWNS’s warning. According to the CivPol Program Manager Richard Cashon, “The task orders in Afghanistan had a little bit more time on them____ It could have been conceivable *459 to continue with WWNS in Afghanistan, if the situation dictated it, even though we were transitioning out of Iraq.” (J.A. 1678.) According to DynCorp’s own PowerPoint presentation, the “[fjinal transition” from WWNS was not set to occur until October 9, 2006. (J.A. 2791.) Thus, even if, by July 26, 2006, DynCorp’s decisionmakers were already scheming to terminate the CivPol Subcontract, they still had plenty of time to reverse their decision in order to avoid violating § 1981.
Accordingly, I find that there was sufficient evidence that DynCorp was aware that its actions might violate WWNS’s federally protected rights,[2] and I would not vacate the punitive damage award on this ground.
In addition, because DynCorp did not properly object to the district court’s punitive damage instruction to the jury, and because the instruction given did not prejudice DynCorp, I would not vacate the award on that ground.
Finally, the amount of the punitive damage award does not violate due process, as argued by DynCorp, and is not assailable for that reason. See State Farm Mut. Auto. Ins. Co. v. Campbell, 588 U.S. 408, 425, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) (holding that a single digit ratio, especially four to one or less, between punitive and compensatory damages is “likely to comport with due process”).
For these reasons, while I otherwise agree with Judge Duncan, I respectfully dissent from setting aside the jury’s punitive damage award.

. The result of the majority holding in this appeal is to remand the case for a new trial solely on to the issue of punitive damages as to Count 3, tortious interference with contract. Punitive damages on that count will be capped by state law at $350,000. Va.Code Ann. § 8.01-38.1 (2007). Under Judge Niem-eyer’s view of the case, the case would be remanded for a new trial as to both liability and damages on the § 1981 claim. Because there is no statutory cap on § 1981 punitives, this result would preserve the possibility of a larger punitive damage award — perhaps as much as $10 million, as awarded by this jury. If WWNS had its option, it might prefer Judge Niemeyer’s result, but of course we do not decide legal issues on the basis of the parties’ preferences.

. It is true, as Judge Duncan points out, that in affirming the punitive damage award, the district court did not cite any evidence that DynCorp had knowledge that it might violate § 1981. However, DynCorp never claimed below that it lacked knowledge of WWNS’s federally protected rights.