NOONAN, Circuit Judge,
dissenting:
The undisputed and dispositive fact is that Pedrin was not known to the government to be predisposed to raid a stash house at the time when an agent of the ATF proposed this action to him. The law is settled: “Government agents may not originate a criminal design, implant in an innocent person’s mind the disposition to commit a criminal act, and induce commission of a crime so that the government may prosecute.” Jacobson v. United States, 503 U.S. 540, 548, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992). In this case, the ATF originated the criminal design, implanted it in Pedrin’s mind and induced him to commit the crime that the government then prosecuted.
Who has the burden of proof as to the defendant’s disposition? In Jacobson, the Supreme Court provided the answer: *798 “[T]he prosecution must prove beyond reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by government agents.” Id. at 549, 112 S.Ct. 1535. The timing of the defendant’s disposition is critical: “The sole issue is whether the Government met its burden of proving that petitioner was pre disposed to violate the law before the Government intervened.” Id. at 549 n. 2, 112 S.Ct. 1535. (italics in original).
No showing has been made that Pedrin was known to be predisposed to commit this crime prior to being approached by the agents of ATF. The ATF laid out the entire stash house scheme to him before he had said a single word. The prosecution of his case should be dismissed.
The majority addresses Pedrin’s claim of outrageous government conduct — a defense that the Supreme Court has never found to be applicable. See United States v. Russell, 411 U.S. 423, 431, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). The majority does not address entrapment for what would appear to be a good reason: entrapment was not argued by Pedrin. It is within our power to hold that the argument was waived. It is also within our power to notice a meritorious argument unmentioned by counsel. See Hormel v. Helvering, 312 U.S. 552, 557, 61 S.Ct. 719, 85 L.Ed. 1037 (1941) (“There may always be exceptional cases or particular circumstances which will prompt a reviewing or appellate court, where injustice might otherwise result, to consider questions of law which were neither pressed nor passed upon by the court or administrative agency below.”); see also Kolstad v. Am. Dental Ass’n, 521 U.S. 526, 540, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999). As a court, we are more than referees tallying scores. We have a live concern that human beings caught in the legal process be treated fairly-
Entrapment is not a defense created by the Constitution or by statute. It is judge-created. It was first recognized by a federal court in a decision of the Ninth Circuit. Woo Wai v. United States, 223 F. 412 (9th Cir.1915). It was first recognized by the Supreme Court in Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932).
Entrapment as a defense is the creation of a collaboration between a court and Congress. What Chief Justice Hughes said in Sorrells was that Congress could not have intended to punish a man trapped into buying bootleg liquor. Chief Justice Hughes did not cite the legislative history of the National Prohibition Act. What he did was to attribute sensible motivation to the authors of the prohibition law. In his reading they did not intend to criminalize the purchase of the liquor when the purchase was induced by a prohibition agent.
This kind of collaboration — the judicial reading of legislative purpose without reference to specific legislative evidence — has a history commanding respect, as Chief Justice Hughes demonstrated beginning with the statement that the literal interpretation of statutes “has frequently been condemned.” Id. at 446, 53 S.Ct. 210. He continued with the invocation of a decision by Chief Justice John Marshall. Sorrells, 287 U.S. at 446, 53 S.Ct. 210.
In Marshall’s decision, United States v. Palmer, 16 U.S. 610, 3 Wheat. 610, 4 L.Ed. 471 (1818), John Palmer and Thomas Wilson of Boston and Barney Colloghan of Newburyport were charged by a federal grand jury with attacking and looting a Spanish ship during the rebellion against Spain in South America. The New England privateers had taken gold and silver worth $60,000 plus a rich cargo of commodities including honey, rum, and sugar. *799 The circuit court divided one — one on the application of the federal piracy statute, and the case was certified to the Supreme Court. No counsel appeared for the prisoners. The government earnestly argued for their conviction. Chief Justice Marshall delivered the opinion of the Court.
In so many words, the statute applied to “any person or persons” who committed piracy. No exceptions were specified. Anyone in the world who committed piracy fell within the law. But had Congress meant to include every person? No, Marshall answered, Congress must have intended only crimes that were against the United States. Palmer, 16 U.S. at 624-35. The prisoners were free.
Analogously, in United States v. Kirby, the defendant was indicted for obstructing the mail. 74 U.S. 482, 7 Wall. 482, 19 L.Ed. 278 (1868). He had acted on a state warrant and arrested a mail carrier on a charge of murder. Speaking for a unanimous court, Justice Stephen Field reversed. His brief opinion appealed to “the common sense of man.” Id. at 487. As Puffendorf had noted, a Bolognese statute that forbad the drawing of blood in the street did not apply to a surgeon who treated a person who fell in the street. Again, as Plowden said, a statute against a jail break would not apply to a prisoner whose life was endangered by fire in the prison. It was “always ... to be presumed” that the legislature intended exceptions that would avoid “injustice, oppression, or absurd consequences.” Id. at 486-87.
In Holy Trinity Church v. United States, a federal statute made it unlawful to prepay the transportation of any aliens who were under contract to perform “service of any kind” in the United States. 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226 (1892). An Episcopal church had paid the way from England of a minister who would be its pastor. The United States sued to collect a penalty. The circuit upheld the fine. The Supreme Court unanimously reversed. The reason for the law, Justice Brewer wrote, was to be found in its legislative history that showed that its purpose was to prevent employers importing “an ignorant and servile class of foreign laborers.” Id. at 463,12 S.Ct. 511. The statute expressly exempted the importation of actors, artists, lecturers, singers, and domestic servants. The existence of these exemptions made by the legislature did not deter the court from adding its own. No purpose against religion could be found in the statute because “this is a religious people.” Id. at 465, 12 S.Ct. 511. The legislature could not have meant to penalize the importation of priests, ministers, or rabbis. Ecumenical within the orbit of religious belief then active in America, the court’s opinion met with acceptance.
Invoking these and other precedents showing the latitude the court enjoyed in creating exceptions to federal law, Chief Justice Hughes in Sorrells turned to the case at hand. Congress could not have meant the prohibition law should be enforced “by the instigation by government officials of an act on the part of persons otherwise innocent in order to lure them by its commission and to punish them.” Sorrells, 287 U.S. at 448, 53 S.Ct. 210. Prosecution in such a case was “outside the purview” of the statute and was “abhorrent to the sense of justice.” Id. at 449, 53 S.Ct. 210. The judgment of conviction was reversed.
In 1958, the Supreme Court explicitly reaffirmed Sorrells’ teaching on entrapment. Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958). Sherman, seeking to overcome an addiction to narcotics, encountered Kalchinian, already active as an informer, who asked Sherman if he knew a good source of *800 narcotics. After several repetitions of the question, Sherman obtained narcotics which he shared with Kalchinian, charging him $15 per delivery. Kalchinian then tipped off a narcotics agent, who observed further sales by Sherman to Kalchinian. At trial, the question was whether Sherman was “already predisposed” to sell the narcotics or whether the informer “had caused an otherwise unwilling person” to sell the drugs. Id. at 371, 78 S.Ct. 819. The district court and the Second Circuit confirmed Sherman’s conviction. Chief Justice Warren, writing for the Supreme Court, reversed, holding it to be “patently clear” that Sherman had been induced by Kalchinian. Id. at 373, 78 S.Ct. 819. The sales to the narcotics agent were not independent acts, but part of a course of conduct by Sherman which was the product of the informer’s inducement. Sherman’s four-year old conviction for selling drugs and his five-year old conviction for buying drugs were not evidence of Sherman’s predisposition when Kalchinian approached him.
Sorrells is a live and controlling precedent. The case has been cited 28 times by the Supreme Court, 102 times by this circuit, and 23 times by district courts within the circuit. Sorrells has never been overruled or treated as irrelevant. Its central holding has not been challenged. Sorrells is an apt precedent for holding the ATF’s stash house trick to be entrapment. In fact, the ATF has exceeded the prohibition agent in Sorrells. He sold actual liquor. The ATF sponsored the theft of imaginary drugs.
The majority correctly concedes that “[w]hat the government learns only after the fact cannot supply the individualized suspicion that is necessary to justify the sting.” Maj. Op. at 797. What did the ATF know about Pedrin before it approached him? The majority does not say. The record says that the ATF knew nothing. It was a shot in the dark when the ATF enlisted Pedrin as a co-conspirator. The majority speaks of a different defendant, Omar Perez, when at page 8 it addresses the question. What the ATF knew of Perez establishes nothing as to what the ATF knew about Pedrin.
Once enlisted, Pedrin recruited others, sketched a scenario for the robbery, and obtained walkie-talkies and scanners. As the ATF had already selected Pedrin as a player in its imagined robbery, none of this activity had any significance. The ATF was already at work with Pedrin cast by the agency as a co-conspirator.
As the case now stands, the ATF enhances its reputation by its successful ruse. The government of the United States is diminished by its dependence on the duplicity of the agency. Because of a choice made by Pedrin or his counsel, entrapment was not argued and Jacobson was uncited. By the rules governing litigation we can affirm Pedrin’s conviction. By our commitment to a humane justice, we are called to dismiss the case made by the entrappers.