<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                United States Court of Appeals
                    For the First Circuit

Nos. 97-1485 & 97-1585
                       RICHARD IACOBUCCI,
                      Plaintiff, Appellee,

                               v.

                        WILLARD BOULTER,
                     Defendant, Appellant.

                      ____________________
No. 97-1586
                       RICHARD IACOBUCCI,
                     Plaintiff, Appellant,

                               v.

                        WILLARD BOULTER,
                      Defendant, Appellee.

         APPEALS FROM THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MASSACHUSETTS

           [Hon. Patti B. Saris, U.S. District Judge]

                             Before

                     Selya, Circuit Judge,
                  Cyr, Senior Circuit Judge,
                  and Lipez, Circuit Judge.
                                
                                
                                
    J. Russell Hodgdon, with whom Petze & Hodgdon was on brief,
for plaintiff.
    Stephen C. Pfaff, with whom Douglas I. Louison and Merrick,
Louison & Costello were on brief, for defendant.

October 4, 1999

                                

 SELYA, Circuit Judge.  Earlier this year, the Supreme
Court decided Kolstad v. American Dental Ass'n, 119 S. Ct. 2118
(1999), affording a fresh perspective on the circumstances under
which juries may award punitive damages in federal civil rights
cases.  These cross-appeals require us to revisit the punitive
damages threshold in light of Kolstad.  After acquitting this
responsibility and addressing other pertinent issues, we affirm the
judgment below.
I.  BACKGROUND
 On the evening of March 26, 1991, Richard Iacobucci, the
plaintiff herein, visited the Pembroke Town Hall to videotape a
scheduled meeting of the Pembroke Historic District Commission (the
Commission).  Such forays were mother's milk to Iacobucci, who
intermittently filmed sessions of local boards, including the
Commission, for a weekly news program that he produced and
broadcast via a cable television outlet.
 On the evening in question, the Commission's stated
purpose was to review building applications.  The commissioners sat
along three sides of a four-sided conference table.  As he had done
in the past, Iacobucci positioned his tripod at the unoccupied end
of the table.  Soon after the meeting commenced, the chairman, Otis
Hathon, twice asked Iacobucci to move his equipment  across the
room.  Iacobucci declined, explaining that his view of the
commissioners' and applicants' faces would be obstructed.  Hathon
did not suffer rejection gladly; at one point, he extinguished the
lights, remarking:  "I hope your camera can see in the dark."  When
this petulance failed to sway Iacobucci, Hathon warned him of the
possibility of arrest should he fail to move.  That warning, too,
fell on deaf ears, prompting a commissioner to alert the local
constabulary.
 Two Pembroke police officers, Flannery and Jenness,
responded.  They asked Iacobucci to turn off the camera and talk
with them in the corridor.  Iacobucci replied that he had a right
to record the proceedings, that he intended to exercise it, and
that he would not converse until the meeting ended.  The stalemated
officers called their superior, Sergeant Willard Boulter (the
principal defendant herein).
 The meeting adjourned before Sgt. Boulter arrived,
presumably because the last applicant had not appeared.  Iacobucci
packed his gear.  He then noticed the commissioners speaking in the
hallway with a man carrying a set of plans.  Believing that man to
be the tardy applicant, Iacobucci retrieved his camera and began
filming the group on the assumption that he was witnessing a de
facto resumption of the adjourned meeting.  Iacobucci persisted
despite importunings from some of the commissioners to stop.
 Sgt. Boulter arrived at that juncture, stepped in front
of the lens, and demanded that Iacobucci cease and desist.  
Iacobucci demurred, sidestepped adroitly, and resumed his
journalistic endeavor.  This pas de deux continued until Sgt.
Boulter gave Iacobucci an ultimatum:  sit down or be arrested.  
When Iacobucci kept filming, Boulter took the camera from him,
grabbed his elbow, led him into another room, handcuffed him, and
placed him under arrest.
 The police transported Iacobucci to the station house and
charged him with disorderly conduct and disrupting a public
assembly.  Iacobucci spent about four hours in custody before the
authorities released him.  When he reclaimed his camera, he
discovered that the videotape no longer contained any images and
that the sound track was barely audible.
 The criminal charges eventually were dismissed, but
Iacobucci (a law school graduate, although not a practicing
attorney) filed a pro se civil action that asserted a golconda of
claims against numerous defendants.  We need not dwell on the
details, because pretrial proceedings winnowed the trialworthy
issues to three claims pressed by Iacobucci against Boulter.  These
included claims under 42 U.S.C.  1983 premised on false arrest and
excessive force, respectively, and a state-law claim premised on
intentional infliction of emotional distress.  The three claims
were tried to a jury, which found for Boulter on two of them.  On
the section 1983 false arrest claim, however, the jury sided with
Iacobucci and awarded him $75,000 in compensatory damages and
$135,000 in punitive damages.
 The verdict did not please Boulter.  He renewed his
earlier motion for judgment as a matter of law and asked,
alternatively, for a new trial or for a remittitur.  The district
court struck the punitive damages, but otherwise denied Boulter's
post-trial motions.  Both parties now appeal.
II.  BOULTER'S APPEAL
 Like all Gaul, Boulter's appeal is divided into three
parts.  He assails the district court's handling of the section
1983 false arrest claim because the court (1) should not have
permitted the claim, if ever properly in the case, to go to trial;
(2) improvidently admitted evidence that was both irrelevant and
prejudicial; and (3) erred in rejecting a qualified  immunity
defense.  We examine these asseverations seriatim.
     A.  The Status of the Section 1983 False Arrest Claim.
 The wrangling over this issue breaks down into two
subsidiary questions:  Was the section 1983 false arrest claim
properly pled?  If so, did it survive summary judgment?  The
district court answered both questions affirmatively.  So do we.
 In narrowing the issues immediately prior to trial, a
dispute arose concerning what claims were outstanding.  Boulter
considered only two claims to be zoetic:  a section 1983 excessive
force claim and a state-law claim for intentional infliction of
emotional distress.  In contrast, Iacobucci took the position that
a section 1983 false arrest claim also remained in the case.  After
reviewing the complaint and the summary judgment record, the lower
court concluded that Iacobucci had adequately pled a section 1983
false arrest claim, and that this claim had not been addressed (let
alone terminated) at the summary judgment stage.  Consequently, the
court allowed Iacobucci to litigate the claim.
 Fed. R. Civ. P. 8(a)(2) requires that a complaint contain
a "short and plain statement of the claim showing that the pleader
is entitled to relief."  The complaint in this case satisfied that
undemanding criterion vis--vis the section 1983 false arrest
claim:  it specifically alleged that Boulter, while acting under
color of state law, violated Iacobucci's constitutional "right to
be secure in his person" and "wrongfully deprived him of his
liberty."  This language, coupled with a prayer for money damages,
adequately stated a section 1983 false arrest claim.
 To be sure, the claim could have been pled more clearly.  
Here, however, Boulter has not identified a scintilla of prejudice
that may have resulted from any obscurity in the wording of the
plaintiff's complaint, nor is any such prejudice readily apparent.  
The section 1983 false arrest claim arises out of the same nucleus
of operative fact as the other two tried claims (both of which
Boulter acknowledges were in the case all along), and the parties'
discussions with the court immediately before the start of trial
clarified any uncertainty about whether the section 1983 false
arrest claim was to be litigated.  The sockdolager is this:  had
prejudice loomed, Boulter could have asked the court for a
continuance.  His failure to do so leads ineluctably to the
conclusion that any claim of unfairness that he now might assert is
nothing more than a post hoc rationalization sparked by a verdict
that was not to his liking.  See Faigin v. Kelly, ___ F.3d ___, ___
(1st Cir. 1999) [No. 98-1589, slip op. at 34] (explaining that "a
reviewing court may attribute special significance to the party's
eschewal of a continuance and assume that the party did not require
additional time to adjust his litigation strategy").
 We likewise reject Boulter's plaint that the section 1983
false arrest claim, even if pled, did not survive the district
court's summary judgment order.  In hawking this proposition,
Boulter points to the concluding passage in the trial court's
summary judgment ruling, in which Judge Saris stated:  "With
respect to Sergeant Boulter, the motion is DENIED on the excessive
force claim pursuant to 42 U.S.C.  1983, and the intentional
infliction of emotional distress claim.  Otherwise it is ALLOWED."  
Boulter maintains that these final four words laid to rest any
incipient section 1983 false arrest claim.
 This argument is too cute by half.  It overlooks that
Boulter's motion, which set the stage for the court's summary
judgment ruling, never sought brevis disposition as to the section
1983 false arrest claim.  Thus, when Boulter made this very
argument below, the district court rejected it, explaining that the
"otherwise" language spoke only to the claims that had been debated
in the summary judgment papers   and that the section 1983 false
arrest claim was not among that number.  A trial court ordinarily
is the best expositor of its own orders, see United States v.
Podolsky, 158 F.3d 12, 17 (1st Cir. 1998); Martha's Vineyard Scuba
Headquarters, Inc. v. Unidentified, Wrecked and Abandoned Steam
Vessel, 833 F.2d 1059, 1066-67 (1st Cir. 1987), and Boulter offers
no convincing reason why we should ignore this salutary principle
here.  Because the district court reasonably interpreted its own
order as not terminating the section 1983 false arrest claim, we
honor its interpretation.
                 B.  The Evidentiary Question.
 Boulter next insists that the trial court erred in
admitting the partially erased videotape into evidence.  He bases
this insistence on three grounds:  lack of relevance, lack of a
proper foundation, and undue prejudice.  We review challenges to
orders admitting or excluding evidence for abuse of discretion.  
See Faigin, ___ F.3d at ___ [slip op. at 24]; Williams v. Drake,
146 F.3d 44, 47 (1st Cir. 1998).  We discern none here.
 The facts are these.  The videotape itself had been
erased by parties unknown (although Iacobucci understandably
suspected the police).  At any rate, the audio portion of the tape
picked up after the time that the police took Iacobucci into
custody.  It apparently recorded contemporaneous conversations
amongst Boulter and his fellow officers.  Boulter's objection runs
to the admissibility of those comments.
 Boulter's first line of attack emphasizes the temporal
sequence.  He argues that an after-the-fact recording necessarily
lacks relevance.  This ipse dixit is simply wrong.  Evidence of
subsequent events frequently sheds light upon, and thus assumes
relevance in relation to, antecedent acts.  See United States v.
Lara, 181 F.3d 183, 204 (1st Cir. 1999); United States v. Sutton,
970 F.2d 1001, 1007 (1st Cir. 1992); United States v. Mena, 933
F.2d 19, 25 n.5 (1st Cir. 1991).
 In this instance, the district court supportably
determined that rational jurors might find that some of the
statements made on the tape referred back to what had transpired at
the time of the arrest.  We recount a sampling in the margin.  
Relevancy is a fluid concept under the Evidence Rules.  See Fed. R.
Evid. 401 (defining relevant evidence as "having any tendency to
make the existence" of any material fact "more probable or less
probable than it would be without the evidence").  Consequently,
relevancy typically presents a rather low barrier to admissibility.  
See, e.g., Fitzgerald v. Expressway Sewerage Constr., Inc., 177
F.3d 71, 75 (1st Cir. 1999); United States v. Saccoccia, 58 F.3d
754, 780 (1st Cir. 1995).  Taking into account that the excessive
force, emotional distress, and false arrest claims were being tried
together, we conclude that Judge Saris acted within the encincture
of her discretion in deciding that the challenged statements
cleared this hurdle.
 Boulter's second line of attack centers on his contention
that the audio portion of the tape ought to have been excluded
because Iacobucci's enhancement of it somehow destroyed the tape's
integrity.  This contention amounts to a claim that the evidence
lacked a proper foundation.  Such claims are committed to the trial
judge's informed discretion.  See United States v. Ladd, 885 F.2d
954, 956 (1st Cir. 1989); see also Fed. R. Evid. 901(a), 1001(2) &
1002.
 Boulter's contention trenches on the frivolous.  
Iacobucci testified to the chain of custody.  He also testified
that he did not alter the tape in any way, but, rather, enhanced
the sound by the simple expedient of listening to it on a high-
quality play-back system that increased its audibility.  The judge
(and the jury, for that matter) were free to credit this testimony,
especially since Boulter offered no evidence to contradict it.  No
more was exigible.
 Boulter's final line of attack postulates that the
failure to identify the voices on the tape prior to its admission
into evidence created unfair prejudice.  See Fed. R. Evid. 403.  
This argument, too, strikes us as insubstantial.
 As noted above, the tape itself was properly
authenticated prior to its admission.  Thereafter, several
witnesses (mainly police officers) testified as to the identities
of the speakers.  Moreover, the officers whose voices were alleged
to have been captured on the tape (Boulter among them) testified at
trial; the jury thus had the opportunity to determine for itself
who spoke which lines.
 Against this backdrop, we see no Rule 403 problem.  The
rule does not aspire to eliminate prejudice   after all, most
evidence is offered precisely because the proponent believes it
will prejudice the factfinder in his favor   but only to eliminate
unfair prejudice.  See, e.g., Veranda Beach Club Ltd. Partnership
v. Western Sur. Co., 936 F.2d 1364, 1372 (1st Cir. 1991); United
States v. Rodriguez-Estrada, 877 F.2d 153, 156 (1st Cir. 1989).  
Given the sound track's potentially significant probative value
(especially in regard to Boulter's state of mind as it pertained to
the section 1983 excessive force claim) and the absence of any
unfairly prejudicial impact, we cannot fault the district court's
overruling of Boulter's Rule 403 objection.  See Freeman v. Package
Mach. Co., 865 F.2d 1331, 1340 (1st Cir. 1988) ("Only rarely   and
in extraordinarily compelling circumstances   will we, from the
vista of a cold appellate record, reverse a district court's on-
the-spot judgment concerning the relative weighing of probative
value and unfair effect.").
                    C.  Qualified Immunity.
 42 U.S.C.  1983 provides a private right of action
against officials who, while acting under color of state law,
deprive individuals of federally assured rights.  But this kind of
rights-violating conduct does not translate automatically into
money damages, for a state actor may enjoy an immunity (absolute or
qualified).  In this instance, Boulter says that the lower court
erred in failing to exonerate him based on the doctrine of
qualified immunity.
 Qualified immunity is a medium through which "the law
strives to balance its desire to compensate those whose rights are
infringed by state actors with an equally compelling desire to
shield public servants from undue interference with the performance
of their duties and from threats of liability which, though
unfounded, may nevertheless be unbearably disruptive."  Buenrostro
v. Collazo, 973 F.2d 39, 42 (1st Cir. 1992) (citing Harlow v.
Fitzgerald, 457 U.S. 800, 806 (1982)).  "Hence, state officials
exercising discretionary authority are entitled to qualified
immunity insofar as their conduct does not transgress clearly
established constitutional or federal statutory rights of which a
reasonably prudent official should have been aware."  Id.  To
ascertain a defendant's eligibility for such immunity, a court must
inquire into the objective legal reasonableness of the defendant's
actions, gauged in connection with the mosaic of legal rules that
were clearly established when the defendant acted.  See Anderson v.
Creighton, 483 U.S. 635, 639 (1987).  In operation, the outcome of
this inquiry "depends substantially upon the level of generality at
which the relevant 'legal rule' is to be identified."  Id.
 Iacobucci  asserts that Boulter, a policeman acting under
color of his official authority, lacked probable cause to arrest
him and thereby violated his Fourth Amendment rights.  In this
wise, he observes that a citizen's right to be free from arrest in
the absence of probable cause has long been clearly established.  
See, e.g., Beck v. Ohio, 379 U.S. 89, 91 (1964).  That observation
sweeps so broadly, however, that it bears very little relationship
to the objective legal reasonableness vel non of Boulter's harm-
inducing conduct.  See Wilson v. Layne, 119 S. Ct. 1692, 1699-1700
(1999).  The "right the official is alleged to have violated must
have been 'clearly established' in a more particularized, and hence
more relevant, sense."  Anderson, 483 U.S. at 640.  Our inquiry,
then, reduces to whether a reasonable police officer, standing in
Boulter's shoes, would have known that arresting Iacobucci for
disorderly conduct, under all the attendant circumstances, would
contravene clearly established law.  That inquiry must proceed in
light of the commonly held understanding that probable cause exists
only if the facts and circumstances within the arresting officer's
knowledge "are sufficient to lead an ordinarily prudent officer to
conclude that an offense has been, is being, or is about to be
committed, and that the putative arrestee is involved in the
crime's commission."  Logue v. Dore, 103 F.3d 1040, 1044 (1st Cir.
1997).
 Before wrestling with this question, we pause to voice
some procedural concerns.  Boulter first raised the issue of
qualified immunity in a pretrial motion for summary judgment.  
Although he tries in this forum to assign error to the denial of
that motion, a pair of procedural impediments frustrates the
attempt.  For one thing, an order denying summary judgment
typically does not merge into the final judgment and therefore is
not an independently appealable event if the case thereafter
proceeds to trial.  See Eastern Mountain Platform Tennis, Inc. v.
Sherwin-Williams Co., 40 F.3d 492, 497 (1st Cir. 1994).
 For another thing, in his notice of appeal, Boulter
purported to challenge only the amended judgment entered by the
district court on March 31, 1997   a decree sparked by the court's
denial of his motion for judgment as a matter of law.  "It is
black-letter law that a notice of appeal must specify the order or
judgment to which the appeal is addressed."  Lehman v. Revolution
Portfolio LLC, 166 F.3d 389, 395 (1st Cir. 1999) (citing Fed. R.
App. P. 3(c)).  Boulter's failure to specify the order denying
summary judgment in his notice of appeal thus bars his current
attempt to contest the propriety of that ruling.  See id.
 In all events, the district court supportably concluded
that Boulter's summary judgment motion did not seek to test the
bona fides of the section 1983 false arrest claim.  See supra Part
II(A).  Since the scope of the protection afforded by the doctrine
of qualified immunity is claim-specific, see, e.g., Feliciano-
Angulo v. Rivera-Cruz, 858 F.2d 40, 48 (1st Cir. 1988); Vazquez
Rios v. Hernandez Colon, 819 F.2d 319, 326-28 (1st Cir. 1987), this
omission means that Boulter could not have raised a qualified
immunity defense as to that claim at the summary judgment stage.  
And Boulter's assertion in the motion papers of a qualified
immunity defense in regard to Iacobucci's section 1983 excessive
force claim cannot fill this void.
 Notwithstanding these infirmities,  the qualified
immunity issue is not a dead letter.  Although qualified immunity
normally should be resolved early in the litigation, see Mitchell
v. Forsyth, 472 U.S. 511, 526 (1985), the defense, if preserved,
may be pressed at later stages, including in a timeous post-trial
motion.  See, e.g., Consolo v. George, 58 F.3d 791, 794 (1st Cir.
1995).  Because Boulter filed such a motion and now assigns error
to its denial, the issue must be addressed.
 In the ordinary course, we review the district court's
denial of qualified immunity de novo, aligning the evidence most
favorably to the non-movant and drawing all reasonable inferences
in his favor.  See, e.g., Camilo-Robles v. Hoyos, 151 F.3d 1, 8
(1st Cir. 1998); Amsden v. Moran, 904 F.2d 748, 752-53 (1st Cir.
1990).  But this familiar formulation of the standard arises in
connection with pretrial orders granting or denying qualified
immunity, and Iacobucci maintains that the intervening trial and
verdict pretermit (or, at least, reconfigure) the inquiry.  He
points out that when Boulter made the arrest, he charged Iacobucci
with having committed two offenses:  disorderly conduct and
disturbing a public assembly.  Iacobucci notes correctly that this
charging decision circumscribes the inquiry into probable cause.  
Building on this foundation, he posits that we need not look beyond
the verdict, in which the jury, answering a special interrogatory,
found that no reasonable police officer would have believed that
Iacobucci had committed either offense.  Boulter resists this
approach:  he asserts that the jury's merits determination neither
extinguishes nor bears upon his claim of entitlement to qualified
immunity.
 Not surprisingly, there is a middle ground.  A state
actor may be entitled to qualified immunity for rights-violating
conduct as long as he had an objectively reasonable basis for
believing that his conduct would not abridge the rights of others.  
See Camilo-Robles v. Zapata, 175 F.3d 41, 43 (1st Cir. 1999);
Quintero de Quintero v. Aponte-Roque, 974 F.2d 226, 228 (1st Cir.
1992).  This means, of course, that the reasonableness standards
underlying the probable cause and qualified immunity inquiries are
not coterminous.  See Anderson, 483 U.S. at 641.  Thus, the jury's
determination does not squarely answer the question whether
Boulter's conduct in arresting Iacobucci satisfied the criterion of
objective legal reasonableness so as to entitle him to qualified
immunity.
 Nor does the procedural posture in which Boulter's appeal
arises greatly influence the standard of review.  When a qualified
immunity defense is pressed after a jury verdict, the evidence must
be construed in the light most hospitable to the party that
prevailed at trial.  See Thompson v. Mahre, 110 F.3d 716, 721 (9th
Cir. 1997); Karnes v. Skrutski, 62 F.3d 485, 494 (3d Cir. 1995);
Posr v. Doherty, 944 F.2d 91, 95-96 (2d Cir. 1991).  One difference
is that, in such an exercise, deference should be accorded to the
jury's discernible resolution of disputed factual issues.  See
Frazell v. Flanigan, 102 F.3d 877, 886 (7th Cir. 1996).
 With this paradigm in mind, we turn to the facts.  The
first of the two charges on which Boulter arrested Iacobucci   
disorderly conduct   implicated Mass. Gen. Laws c. 272,  53.  In
pertinent part, the statute makes it a misdemeanor to be a
"disorderly person."  To stave off constitutional attacks, the
Massachusetts Supreme Judicial Court (SJC) originally construed
section 53 to provide that one is guilty under that rubric  
   . . . if, with purpose to cause public
 inconvenience, annoyance or alarm, or
 recklessly creating a risk thereof, he:  (a)
 engages in fighting or threatening, or in
 violent or tumultuous behavior; or (b) makes
 unreasonable noise or offensively coarse
 utterance, gesture or display, or addresses
 abusive language to any person present; or (c)
 creates a hazardous or physically offensive
 condition by any act which serves no
 legitimate purpose of the actor.

Alegata v. Commonwealth, 231 N.E.2d 201, 211 (Mass. 1967) (quoting
Proposed Official Draft of Model Penal Code  250.2).
 In the next decade, the SJC narrowed this definition of
disorderly conduct to encompass only activities not implicating the
"lawful exercise of a First Amendment right."  Commonwealth v. A
Juvenile, 334 N.E.2d 617, 628 (Mass. 1975).  To ensure that result,
the SJC modified its earlier definition by striking subsection (b)
entirely and interpreting subsections (a) and (c) to cover only
conduct, not expressive activity.  See id. at 629.  Consistent with
this approach, the SJC subsequently held that a verbal challenge,
even when coupled with a refusal to obey a police officer's orders,
does not constitute disorderly conduct within the meaning of
section 53 as long as done in furtherance of a legitimate purpose.  
See Commonwealth v. Feigenbaum, 536 N.E.2d 325, 328 (Mass. 1989).  
To this extent, then, the contours of the disorderly conduct
statute were clearly visible when Boulter confronted Iacobucci at
the Pembroke Town Hall.
 Context is important in police work, as elsewhere in
human intercourse.  Thus, upon being apprised of the ongoing events
at the Town Hall, Boulter recognized that the circumstances
required a reasonable police officer to take into account the
Massachusetts Open Meeting Law, Mass. Gen. Laws c. 39,  23B, and
he took steps to refresh his recollection of that enactment.  The
statute requires that "[a]ll meetings of a governmental body . . .
be open to the public," and confers a right to videotape such
meetings on "any person in attendance."  The right to videotape is
not unfettered:  the camera must be "fixed in one or more
designated locations determined by the governmental body," and the
taping may not actively interfere "with the conduct of the
meeting."  Id.  Withal, the statute does "not apply to any chance
meeting, or a social meeting at which matters relating to official
business are discussed so long as no final agreement is reached."  
Id.
 Given this background, we are constrained to conclude
that, taking the evidence in the light most flattering to
Iacobucci, his constitutional right to act as he did without being
arrested for disorderly conduct was "sufficiently clear that a
reasonable official would [have understood] that what he [was]
doing violate[d] that right."  Anderson, 483 U.S. at 640; accord
Wagenmann v. Adams, 829 F.2d 196, 209 (1st Cir. 1987).
 Taking first the events that transpired in the meeting
room, we note that Iacobucci had satisfied the basic prerequisites
for entitlement to videotape a public meeting under the Open
Meeting Law:  he had situated his tripod in the only stationary
location that would allow the mounted camera to capture the faces
of both the commissioners and the applicants and there is no
significantly probative evidence that his activities interfered
with the ongoing meeting.  Indeed, his equipment had been placed
in the very same location during prior Commission meetings, without
incident.  Moreover, after Hathon tired of trying to bully
Iacobucci, the instant meeting proceeded without disruption and the
Commission completed its business unimpeded by the filming.  
Iacobucci remained cool, calm, and collected throughout.  Under the
circumstances and in light of the clearly established law that
obtained at the time of the incident, we agree with Judge Saris
that an objectively reasonable officer would not have thought that
Iacobucci was subject to arrest for disorderly conduct.
 Taking next the hallway episode, we find nothing whatever
to suggest that Iacobucci was "fighting or threatening," or was
engaged in any "violent or tumultuous behavior."  A Juvenile, 334
N.E.2d at 628; see also Sheehy v. Plymouth, ___ F.3d ___, ___ (1st
Cir. 1999) [No. 98-2080, slip op. at 16].  On any version of the
events reflected in the record, no objectively reasonable police
officer would have believed that Iacobucci had created a "hazardous
or physically offensive condition . . . which serve[d] no
legitimate purpose."  A Juvenile, 334 N.E.2d at 628.  Even if the
gathering was not a public meeting at that point, Iacobucci was
doing nothing wrong:  he was in a public area of a public building;
he had a right to be there; he filmed the group from a comfortable
remove; and he neither spoke to nor molested them in any way.
 Boulter's repeated demands that Iacobucci cease recording
do not change the disorderly conduct calculus.  A police officer is
not a law unto himself; he cannot give an order that has no
colorable legal basis and then arrest a person who defies it. So it
is here:  because Iacobucci's activities were peaceful, not
performed in derogation of any law, and done in the exercise of his
First Amendment rights, Boulter lacked the authority to stop them.
 The other ground of arrest fares no better under close
scrutiny.  That ground implicated Mass. Gen. Laws c. 272,  40,
which makes it a misdemeanor to "willfully interrupt[] or disturb[]
a school or other assembly."  As to the events that transpired in
the meeting room, the record, read as it must be in the light most
favorable to Iacobucci, contains no evidence that he "interrupted
or disturbed" the Commission's meeting.  See supra note 5 and
accompanying text.  As to the events that transpired in the
hallway, Boulter was adamant in his insistence that the hallway
gathering was not a public meeting.
 There is no point in flogging a dead horse.  We conclude
that the district court did not err in holding that Boulter's
arrest of Iacobucci failed to attain the level of objective legal
reasonableness.  Hence, Boulter was not entitled to qualified
immunity.
III.  IACOBUCCI'S APPEAL
 Although voicing doubts about whether a satisfactory
foundation for punitive damages had been laid, the district court
prudently reserved judgment on that question and sent it to the
jury.  After the jurors awarded Iacobucci $75,000 in compensatory
damages and $135,000 in punitive damages, Boulter moved for relief.  
Concluding that the evidence failed to warrant punitive damages,
the district court struck that portion of the award (albeit leaving
intact the compensatory damages).  Iacobucci contests this ruling.  
We review the lower court's decision de novo, taking the facts and
the reasonable inferences therefrom in the light most congenial to
the jury's verdict.  See Correa v. Hospital San Francisco, 69 F.3d
1184, 1188 (1st Cir. 1995).
 The district court's approach accurately foretold that
taken by the Supreme Court a few months later in Kolstad v.
American Dental Ass'n, 119 S. Ct. 2118 (1999).  Punitive damages
become a discretionary matter for the jury in a section 1983 action
only if the plaintiff makes an adequate threshold showing.  A
plaintiff reaches that threshold when "the defendant's conduct is
shown to be motivated by evil motive or intent, or when it involves
reckless or callous indifference to the federally protected rights
of others."  Smith v. Wade, 461 U.S. 30, 56 (1983).
 Kolstad sheds considerable light on Smith and the
circumstances under which a judge may permit a jury to consider a
request for punitive damages in a civil rights case.  The Smith
standard, visualized through the Kolstad lens, confirms that there
is a different focus for compensatory as opposed to punitive
damages.  See Kolstad, 119 S. Ct. at 2124.  The special showing
needed to trigger eligibility for punitive damages, which the Smith
Court called "evil motive" or "reckless  or callous indifference,"
Smith, 461 U.S. at 56, pertains to the defendant's "knowledge that
[he] may be acting in violation of federal law, not [his] awareness
that [he] is engaging in discrimination," Kolstad, 119 S. Ct. at
2124.  Thus, the standard requires proof that the defendant acted
"in the face of a perceived risk that [his] actions [would] violate
federal law."  Id. at 2125.  While "egregious or outrageous acts
may serve as evidence supporting an inference of the requisite
'evil motive,'" the presence (or absence) of such acts does not in
itself determine the propriety (or lack of propriety) of punitive
damages in a given case.  Id. at 2126.
 To make out a jury question on punitive damages under
this subjectively oriented test, Iacobucci needed to adduce
evidence sufficient to prove that Boulter arrested him in the face
of a perceived risk that doing so would violate Iacobucci's
federally assured rights.  More specifically, Iacobucci needed to
adduce evidence sufficient to show that Boulter determined to
effectuate the arrest knowing that he lacked probable cause to do
so, or, at least, with conscious indifference to the possibility
that he lacked probable cause.
 We realize that the district court instructed the jury to
determine whether Boulter had acted intentionally or recklessly in
arresting Iacobucci, and that the jury, by returning a plaintiff's
verdict on the section 1983 false arrest claim, necessarily found
that Boulter's conduct fit into that proscribed category.  This
mens rea finding, however, does not clear the way for punitive
damages.  The state of mind required to make out a cognizable
section 1983 claim (at least one grounded in false arrest) differs
importantly from that required to justify punitive damages.  See
Kolstad, 119 S. Ct. at 2124.  The former requirement relates only
to the conduct, not to the consequence; that is, it entails an
intent to do the act, not to effect a civil rights violation.  See
id.
 On this issue, the district court concluded that although
Boulter made an objectively unreasonable split-second decision when
he arrested Iacobucci, no evidence suggested that he harbored any
malice or acted with reckless indifference to Iacobucci's
constitutional rights.  After carefully scrutinizing the record, we
agree with this assessment.  Viewed most favorably to Iacobucci,
the evidence reveals that when apprised of the contretemps, Boulter
called a selectman to get a better sense of the Open Meeting Law.  
Upon his arrival, he attempted to piece together a complete picture
of the evening's events.  He then  made several attempts to defuse
a contentious situation.  Only after his attempted intercessions
were rebuffed did he effect an arrest.  This constellation of facts
does not lend itself to the inference that Boulter acted with an
evil motive or a conscious awareness that the arrest might violate
Iacobucci's civil rights.  Where, as here, the evidence shows no
more than that an exasperated police officer, acting in the heat of
the moment, made an objectively unreasonable mistake, punitive
damages will not lie.
 Laboring to close this gap, Iacobucci suggests that the
partially erased videotape contains evidence indicative of a state
of mind conducive to punitive damages.  He points to a statement
contained therein from which (he says) the jury could have inferred
that the videotape had been erased to provide cover against a
potential excessive force claim.  The jury, however, found for
Boulter on the section 1983 excessive force count   and the
videotape contains nothing that bears on Boulter's motives in
connection with the arrest.  We conclude, therefore, that this
evidence fails to lift the punitive damages issue into the realm of
the jury's discretion.
 To summarize, the district court acted appropriately in
defenestrating the punitive damages award.  The dearth of record
evidence, direct or circumstantial, as to Boulter's evil motive
and/or subjective awareness that he lacked probable cause to arrest
Iacobucci suffices to defeat the claim for punitive damages as a
matter of law.
 We add a coda.  Precedent in this circuit had interpreted
Smith to mean that in civil rights cases requiring proof of
intentional wrongdoing, "the state of mind necessary to trigger
liability for the wrong is at least as culpable as that required to
make punitive damages applicable."  Rowlett v. Anheuser-Busch,
Inc., 832 F.2d 194, 205 (1st Cir. 1987).  Kolstad plainly rejects
that interpretation.  To the extent that Rowlett fails to draw a
distinction between the state of mind requirement anent the actor's
conduct and the state of mind requirement anent the effects of that
conduct, it is no longer good law, and we disavow it.
IV.  CONCLUSION
 We need go no further.  For the reasons set forth above,
we reject all three appeals and leave the parties where we found
them.

Affirmed.  Each party to bear his own costs.

</body>

</html>