Cynthia SZWAST, Individually and as next friend of Matthew Szwast and Amber Szwast, minors, Plaintiffs,

v.

CARLTON APARTMENTS and Kratt & Associates, Michigan Limited Corporation, Defendants.

No. 99–70517.

United States District Court, E.D. Michigan, Southern Division.

July 10, 2000.

Regina L. Meo, Sterling Heights, MI, for Plaintiffs.

David E. Prine, Howell, Michael A. Carvin, Cooper, Carvin & Rosenthal, PLLC, Washington, DC, for Defendant.

### Opinion and Order

FEIKENS, District Judge.

## I. Introduction

Cynthia Szwast, on behalf of herself and as Next Friend to her two minor children, Matthew and Amber Szwast (collectively the plaintiffs), sued Carlton Apartments and its owner, Kratt & Associates (collectively the defendants) for a violation of the Fair Housing Act's prohibition against discrimination based on familial status in the rental of housing. *See* 42 U.S.C. § 3604. Familial status means "one or more individuals (who have not attained the age of 18 years) being domiciled with... a parent." 42 U.S.C. § 3602(k).

On November 29, 1999, I granted summary judgment for the plaintiffs based on the Fair Housing Act.[1] At that hearing, the plaintiffs presented uncontroverted evidence that a manager of Carlton Apartments, Rosemary McKenzie, told Cynthia Szwast that they did not rent upper-story apartments to families with children.

The case proceeded to a jury trial on damages. The jury awarded the plaintiffs $3,000 in compensatory damages and $400,000 in punitive damages.

The defendants have now moved for a new trial, or in the alternative, remittitur. The plaintiffs have filed a motion for attorney's fees.

## II. The Jury Instructions

In the Amended Joint Pre–Trial Statement, *see* Local Rule 16.2(a) the defendants agreed to the jury instructions which they now assert were erroneous. At trial, I asked defense counsel twice, outside the presence of the jury and before the jury started deliberations, whether he had any objections to the instructions on damages.

Twice, he said no. *See* Tr. 14–III, Tr. 52–III. At final argument, defense counsel told the jury: "Please listen very carefully to the Judge's instructions because they're very well thought out; they represent the law." Tr. 37–III.

The defendants now argue that:

The jury instructions were so riddled with misstatements of law that, viewed as a whole, they were confusing and misleading and resulted in a miscarriage of justice; such obvious and prejudicial error in instructing the jury constitutes grounds for a new trial.

Def't's Br., p. 5.

■ Rule 51 of the Federal Rules of Civil Procedure instructs:

No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection. Opportunity shall be given to make the objection out of the hearing of the jury.

Nonetheless, the defendants do have, in a motion for new trial, grounds to assert error in the instructions, although these grounds are limited by the failure to object at trial. The United States Court of Appeals for the Sixth Circuit has held:

Obvious and prejudicial error in instructing the jury constitutes grounds for a new trial even if the party assigning the instructions as error failed to object before the trial court. The grant of a new trial under these circumstances falls within the trial court's discretion to act to prevent a miscarriage of justice.

*Fryman v. Federal Crop Insurance Corp.*, 936 F.2d 244, 248 (6th Cir.1991) (citations omitted). Thus, I must inquire "whether the instructions as a whole provide[d] the jury with sufficient guidance concerning the issues to be tried." *Id.* (citation omitted).

■ The defendants contend that the instructions on punitive damages were

---

1. Because I granted summary judgment on the plaintiffs' Fair Housing Act claim, their

claims based on Michigan's Elliot–Larsen Act and on negligence became moot.

faulty. As to punitive damages, I gave the following instructions:

[T]he Fair Housing Act allows a jury to award punitive damages against a defendant. Punitive damages may be awarded for two reasons: one, to punish a defendant for its misconduct; or two, to deter a defendant or other persons from acting in the same way in the future.

[D]amages may be awarded against defendants if the plaintiffs have proven either that the defendants' misconduct was motivated by an intent to discriminate or that the defendants' conduct involved reckless disregard or callous indifference to the legal rights of the plaintiff that are protected by the laws that are involved in this case. Under the Fair Housing Act, it is not necessary for the plaintiffs to show that the defendant acted with actual malice or evil towards the plaintiff.

"Reckless disregard or callous indifference" means that the defendant deliberately disregarded the plaintiff's rights. For example, a defendant has acted with reckless disregard or callous indifference when the defendants knew or should have known that the plaintiff was in danger of being harmed and that the defendant could have taken steps either to ensure that the plaintiff was not harmed or that the harm to the plaintiff was corrected but that the defendants failed to take such steps. If for example, you find that a defendant had knowledge of the Fair Housing Act but took insufficient steps to avert harm to the plaintiff, you may award punitive damages on this basis to the plaintiff.

Trial Transcript (Tr.) 46–47–III.

In *Smith v. Wade,* the Supreme Court applied the common law standard for puni-

tive damages to a case involving a violation of 42 U.S.C. § 1983; it held: "reckless or callous disregard for the plaintiff's rights, as well as intentional violations of federal law, should be sufficient to trigger a jury's consideration of the appropriateness of punitive damages." 461 U.S. 30, 51, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). This standard applies to the violation of rights guaranteed under the Fair Housing Act. The instructions in this case reflected the proper standard for punitive damages.

■ The defendants also assert error in the instructions on assessing punitive damages on a principal for an agent's conduct. In a Title VII action, the Supreme Court acknowledged that agency principles may limit a principal's liability for punitive damages. *See Kolstad v. American Dental Assn.,* 527 U.S. 526, 543, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999). The Court quoted the Restatement on Agency:

Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if:

. . .

(d) the principal or a managerial agent of the principal ratified or approved that act.

*Id.* (quoting Restatement (Second) of Agency § 217 C (1957)).[2]

As to ratification, I gave these instructions:

In deciding whether to award punitive damages against defendants, you must consider the conduct of the defendants' agents and employees. A plaintiff may recover punitive damages from a defendant acting solely in his capacity as

---

2. To ensure that principals who engage in good faith efforts to prevent discrimination under Title VII are not punished, the Court modified the Restatement's "scope of employment" rule so that "an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's 'good faith efforts to comply with Title VIII.'" *Kolstad,* 527 U.S. at 545, 119 S.Ct. 2118 (citation omitted). This modification does not apply here where the instructions reflect the Restatement's "ratification" rule.

property owner if you find that the defendant endorsed the discrimination of the employees to whom it had delegated rental responsibilities. Punitive damages may be awarded if you find that the defendant ratified the acts of such agents or employees.

You may award damages—punitive damages, that is,—against a property owner based on the actions of an employee if you find that the defendant either deliberately or through knowledgeable inaction authorized or fostered, or encouraged the acts complained of by Plaintiff, or condoned or ratified those acts. Punitive damages may be awarded against a property owner on the basis of the acts of agents of an employee even—or employee even though an owner, such as in this case, has limited or no direct dealings with the plaintiffs.

"Ratification" means approval of an act after it is done. Whether or not an owner of rental property ratified the conduct of a person to whom it had delegated rental responsibilities may be inferred from the circumstances of the case and the conduct of the parties. Ratification need not be formal but may be inferred from the conduct of the parties, including what actions, if any, they took after the action came to their attention.

For example, if you find that Carlton Apartments did not adequately discipline or provide training to Rosemary McKenzie after it was discovered that she had made a discriminatory comment a few years before making the same comment to Mrs. Szwast, you may find that it acted callously or indifferently or in disregard of Mrs. Szwast's rights and thereby ratified the acts of Rosemary McKenzie.

Tr. 47–49–III. I find that these instructions properly explained the standard for assessing punitive damages on a principal for an agent's conduct. Since the instructions, initially approved by defense counsel, properly instructed the jury, the defendants did not suffer a "miscarriage of justice" warranting a new trial.[3]

## III. Foreclosing Witness Testimony

■ The defendants also assert as error my conduct in cutting off defense counsel's questioning of Mrs. Kratt, one of the owners of defendants Carlton Apartments and Kratt & Associates, because I foreclosed the defendants' ability to demonstrate to the jury Mrs. Kratt's lack of intent to violate the Fair Housing Act. The defendants' argument is based on the following exchange during Mrs. Kratt's testimony:

Q. [Defense counsel, Mr. Prine]: In formulating your—your business practices and policies regarding applicants, have you ever had any intent to discriminate against persons with children?

A. [Mrs. Kratt]: No.

Q. I know you have a problem with this, but the Court has already ruled that there's liability for violation of the Act.

THE COURT: And— and it's on that point, Mr. Prine, that I think I've got to say to you again, and to the jury, that based on the hearing that I conducted in this case in which you were present and testimony through the furnishing of affidavits was taken, I found that the defendant had violated the Fair Housing Act. That's a matter of record in this case, that there is a violation. You understand that.

MR. PRINE: Yes, Judge.

3. Additionally, the defendants mark as error an instruction stating that embarrassment and humiliation are natural consequences of discrimination and an instruction stating: "Thus, you may infer emotional injury from such conduct." Def'ts' Br., p. 11–12. In so arguing, the defendants do not cite to the record. If they had bothered to cite this statement, they would have discovered that the jury heard no such instruction. The complained-of instruction comes from the parties' Amended Joint Pretrial Statement, p. 7, but, I read no such instruction and the parties agreed to my reading, see Tr. 52–III.

THE COURT: There was no material issue of fact at the time of the hearing that showed anything other than that there was a violation of the Housing Act.

Now, I've raised the question with [plaintiffs' attorney] earlier in this case that she wanted to go back into liability again. Now I find you're doing it.

MR. PRINE: I don't intend to, your Honor. I'm sorry.

THE COURT: Well, you are doing that, though.

MR. PRINE: I'm trying to lay a foundation for a further question, your Honor.

THE COURT: The point is that on the basis of the hearing in which you fully participated, I found as a matter of law that your client had violated the Fair Housing Act, and I so instructed the jury.

If what you're trying to do now is to introduce testimony to show that the Fair Housing Act was not violated [...] that would not be permitted. That's already a finding on this record.

MR. PRINE: I do not intend to do so, your Honor.

. . .

Q. [by Mr. Prine]: *You stated that it was not your intent to discriminate, either in the provision or the application for this housing, correct?*

A. *That's correct.*

Q. In your dealings with Rosemary and Larry McKenzie, do you believe you showed any disregard of the law?

A. No, I do not feel I did.

Q. And with regard to the applicants, do you believe that your procedures provided for aa fair and legal means of determining who could and could not move in?

A. Yes.

THE COURT: Mr. Prine, I have to remind you again that that question is foreclosed. I don't hear any objection from Ms. Meo [plaintiffs' counsel], which

is troublesome, but the fact that both of you are trying to re-litigate this liability issue is bothersome to me.

As a matter of law, I have found that the Carlton Apartments violated the Fair Housing Act. Ignorance of the law is no excuse. Intent not to disobey the law is no excuse. In this case, there was a violation.

The question is what damages, if any, flowed from the violation. That's the issue before this jury.

MR. PRINE: Judge, I understand. I don't intend to [...] ask any further questions, and I understand that these all relate to the punitive damages.

THE COURT: But... you are intending ... to get through the back door, Mr. Prine, what you are not permitted to do... through the front door. You're trying to get around my ruling by asking Ms. Kratt, "did you intend to violate?" That's not the issue. There was a violation.

MR. PRINE: I apologize. I'll withdraw the question, and I... close my questioning.

Tr. 129 –133–III (emphasis added).

The defendants incorrectly contend that I foreclosed any testimony by Mrs. Kratt regarding her intent to discriminate. I allowed defense counsel's question regarding Mrs. Kratt's intent to violate the law: as indicated above, Mrs. Kratt testified that she did not intend to discriminate and that she felt that she did not disregard the law.

I did foreclose inquiry as to whether Mrs. Kratt discriminated. In each instance, I did not allow defense counsel to inquire as to Mrs. Kratt's view of whether she violated the Fair Housing Act. In the first instance, defense counsel asked Mrs. Kratt whether she discriminated and, then, introduced a question by pointing to Mrs. Kratt's disagreement with the ruling on liability. In the second instance, I did not allow defense counsel to ask Mrs. Kratt for her opinion as to the legality of her proce-

dures for renting apartments. By his questions, defense counsel attempted to open up the issue whether the defendants discriminated, an issue I settled by ruling on summary judgment. The defendants may not claim error because I did not allow a witness to express to the jury her disagreement with my summary judgment ruling; her opinion on that matter is irrelevant.

In cautioning defense counsel, I stated: "Intent not to disobey the law is no excuse." While intent is a factor in the determination of punitive damages, my statement referred to whether intent excused the violation. In any event, any confusion my statement may have caused the jury was cured by my instruction that punitive damages are to be awarded only if the defendants' conduct was "motivated by an intent to discriminate or . . . involved reckless disregard or callous indifference to the legal rights of the plaintiff. . . ." Tr. 47–III.

Because the defendants had and took the opportunity to present testimony as to Mrs. Kratt's intent, their argument that I foreclosed such testimony fails.

## IV. Compensatory Damages

With little explanation, the defendants contend there was insufficient evidence regarding compensatory damages. Plaintiff Cynthia Szwast testified as to her son's distress after learning about his mother's conversation with the Carlton Apartments' manager and she testified as to her own distress. Cynthia Szwast testified that she felt crushed, embarrassed, and ashamed from the rejection, that she suffered emotional distress from having to explain the situation to her children, and that she felt heartbroken when her son seemed to blame himself for his mother's inability to get a larger apartment. *See* Tr. 28–31–II, 41–II.

■ Emotional distress damages are recoverable in a housing discrimination case. *See Stewart v. Furton,* 774 F.2d 706, 710 (6th Cir.1985). Cynthia Szwast testified as to her emotional distress and that of her son. Such evidence was sufficient to sustain the award of compensatory damages to the plaintiffs.

## V. Punitive Damages and Analysis under *BMW:*

While the evidence supported an award of punitive damages, the amount of $400,000 is excessive. Instead, I order remittitur of the award to $30,000.

■ Mrs. Kratt's testimony and the evidence provided by testing conducted by the Fair Housing Center warranted an award of punitive damages. Mrs. Kratt's testimony demonstrated purposeful ignorance of the Fair Housing Act, *see* Tr. 136–37–II, in spite of the fact that in 1996 she was aware of allegations of violations of the Fair Housing Act regarding familial discrimination, *see* Tr. 134–II. As a result of this purposeful ignorance, the defendants violated the Fair Housing rights of prospective tenants, including the plaintiffs. Such purposeful ignorance constituted reckless disregard for the Fair Housing rights of prospective tenants, which exposed the defendants to punitive damages. Punitive damages are also warranted because Cynthia Szwast's phone call was not an isolated incident as evidenced by the testing of the Fair Housing Center. *See* Tr. 83–144 *passim* (testimony of testers); PXs 1 and 2 (Fair Housing Center records).

A punitive damage award in this case would vindicate the public interest by emphasizing to landlords that they cannot discriminate based on familial status. In addition, I find there is no excuse for not inquiring as to the obligations of landlords under the Fair Housing Act given that the defendants faced a similar allegation in 1996.

The defendants argue that there was unrebutted evidence that the defendants had a policy of not discriminating and that given this policy, punitive damages are

unwarranted. This evidence consisted, at best,[4] of Mrs. Kratt's testimony that the defendants' policy is not to discriminate. But, there was no evidence of a written policy and Mrs. Kratt admitted that, following the 1996 allegations, she did not discuss the Fair Housing laws *per se* with the managers. *See* Tr. 66–II. In response to a question asking her whether Carlton Apartments had a policy implementing the Fair Housing Act, Mrs. Kratt stated, "We do not discriminate at Carlton Apartments." Tr. 68–II; *see, also,* Tr.135–II

In relying on the argument that the evidence of a policy implementing the Fair Housing Act is unrebutted, the defendants have assumed that the jury believed the evidence presented. The only evidence of any policy was Mrs. Kratt's testimony. The only evidence that the defendants did allow children on the upper floors was Mrs. Kratt's testimony, which was called into question on cross-examination. *See* Tr. 133–II. Given the lack of a written policy and Mrs. Kratt's rote response that "we do not discriminate" to a variety of questions, the jury may have concluded that the "lady doth protest too much" and may have chosen to give her testimony no credence.

I now turn to the defendants' argument that the jury award of punitive damages was excessive and, thus, violated their rights to due process. In doing so, I also examine whether a remitittur to $30,000 passes constitutional muster under the same standards.

 In determining the excessiveness *vel non* of a punitive damage award, I rely on the factors set out by the Supreme Court in *BMW of North America v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d

809 (1996).[5] In *BMW,* the Supreme Court analyzed the punitive damage award by examining three guideposts: the degree of reprehensibility of the conduct; the disparity between the harm or potential harm suffered and the punitive damages award; and the difference between the punitive damages awarded and the civil penalties authorized or imposed in comparable cases. *See id.* at 575, 116 S.Ct. 1589.

### A. Reprehensibility

In assessing the reprehensibility of the defendants' conduct, I note that there was no violent conduct involved, *see id.* at 576, 116 S.Ct. 1589, no "trickery or deceit," *id.* (quoting *TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 462, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993)); nor was there "intentional malice," *see id.* at 468, 113 S.Ct. 2711 (concurring opinion of J. Kennedy). However, "repeated misconduct is more reprehensible than an individual instance of malfeasance." *BMW,* 517 U.S. at 576, 116 S.Ct. 1589. Here, there was evidence of a prior allegation of familial status discrimination and evidence of three separate comparison tests that indicated a pattern of familial status discrimination. This evidence spanned a time range from June 1996 until October 1998.

The reprehensibility inquiry leaves me with a mixed bag. The conduct was not so reprehensible that it justifies a $400,000 award but evidence that the Carlton Apartments engaged in conduct for a long period of time does justify an award sufficient to punish the defendants.

### B. Ratio

The Supreme Court indicated that punitive damages need bear a reasonable rela-

---

4. In contending that there was unrebutted evidence that the defendants did not discriminate, the defendants' brief does not point to any specific evidence in the record.

5. "Although [*BMW of North America v.*] *Gore* examined the excessiveness of punitive damages awarded in a state court, the universal premise of Supreme Court's due process rea-

soning suggests that the same considerations apply equally to the review of punitive damages awarded in federal court." *Lee v. Edwards,* 101 F.3d 805, 809 n. 2 (2nd Cir.1996) (citing *BMW of North America v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996))

tionship "to the harm likely to result from the defendant's conduct as well as the harm that has occurred." *BMW*, 517 U.S. 559, 581, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) (quotation marks and citations omitted). In rejecting a ratio of punitive damages to compensatory damages of 500:1, the Court eschewed a "simple mathematical formula" for determining the propriety of punitive damages. *Id.* at 582, 116 S.Ct. 1589. The Court also noted that "low awards of compensatory damages may properly support a higher ratio, if, for example, a particularly egregious act has resulted in only a small amount of economic damages" or where "the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine." *Id.*

In this case, the ratio of punitive damages awarded by the jury to compensatory damages is about 133 to 1. If not "breathtaking," a term the Court used to describe the impermissible ratio of 500 to 1 in *BMW, see id.* at 583, 116 S.Ct. 1589, this ratio crosses far into the territory of constitutional impermissibility, *see, e.g., Haslip,* at 23–24 (stating that ratio of 4 to 1 comes "close to the line" of constitutional impermissibility).

A punitive damages award of $30,000 represents a ratio of 10 to 1 to the compensatory damages awarded in this case. While the Supreme Court has declared that a 4 to 1 ratio of punitive damages to compensatory damages "may be close to the line" of constitutional permissibility, *see id.,* I must factor in not just the harm to the plaintiffs here but also "the harm *likely to result* from the defendant[s'] conduct." *BMW*, 517 U.S. at 581, 116 S.Ct. 1589 (emphasis added). Defendants' conduct likely resulted in harm to other potential tenants with children as evidenced by the testimony of the testers and the exhibits from the Fair Housing Center. As such a ratio of 10 to 1 does not indicate constitutional impermissibility.

### C. Sanctions for Comparable Misconduct

Comparing the punitive damages award to civil or criminal penalties that could be imposed for comparable misconduct also leads to the conclusion that the $400,000 punitive damages award is excessive.

The Fair Housing Act establishes penalties for civil actions brought by the Attorney General "to vindicate the public interest" not to exceed $50,000 for the first violation and not to exceed $100,000 for any subsequent violation. 42 U.S.C. § 3614(d)(1)(C). For a complainant who elects to have his or her case heard by an administrative law judge, an administrative law judge may assess a civil penalty "to vindicate the public interest" not to exceed $10,000 if the respondent has not committed any prior discriminatory housing practice; not to exceed $25,000 if the respondent has committed one other such practice in the previous five years; and $50,000 if the respondent has committed two or more such practices in the previous seven years. 42 U.S.C. § 3612(g)(3). Given these penalties, there would be no indication to a landlord that a discriminatory act would give rise to a penalty of $400,-000. In comparison to these penalties, a punitive damages award of $400,000 is excessive.

By contrast, a punitive damages award of $30,000 is less than the amount authorized by the Fair Housing Act for the first violation when the Attorney General brings a civil action. Because this provision puts landlords on notice that a discriminatory act may result in a civil penalty of $50,000, a landlord is on notice that a punitive damages award of $30,000 may result from a violation of the Act.

In sum, a punitive damages award of $30,000 reflects the reprehensibility of the defendants' conduct, bears a reasonable relationship to the compensatory damages awarded by the jury, and is comparable to sanctions for similar conduct. By contrast, an award of $400,000 falls within none of those guideposts.

## VI. PreTrial Statement

The defendants assert error in that I permitted the plaintiffs to add witnesses not on the original Pretrial Statement without good cause shown. At the summary judgment hearing on November 29, 1999, some three months before trial, the defendants were aware that testers had been used because the plaintiffs provided evidence of testing as part of their summary judgment motion. In the Joint Pretrial Statement, the defendants agreed to extensive jury instructions regarding testing. Because the defendants were well aware that evidence of testing would be introduced at trial, I allowed the witnesses from the Fair Housing Center to testify.

## VII. Attorney's Fees

■ The plaintiffs have moved for attorney's fees and costs totaling $22,911.55. I have examined these fees and they appear reasonable both as to the scope of work and the hourly rate of $150. Because they are the prevailing party both on the liability issue and the damages issue, I grant the plaintiffs' motion for attorney's fees and costs.[6]

Defendants object to four items in the motion for attorney's fees filed before the trial on damages. They object to an item dated February 4, 1999, "Drafted Complaint, Petition for Appointment of Next Friend, Consent," assessed at 2.1 hours, because the complaint resembles a form from the Fair Housing Center that defendants have received in another, unrelated case. For the same reason, the defendants object to the April 23, 1999, item "Plaintiff's First Interrogatories and Request for Production, Proof of Service, let-

ter to court clerk with copy to opposing counsel" assessed at 1.20 hours. Defendants provide no evidence of these other forms. Even if they had done so, I would still award fees for these items because, even if a complaint is derived from a form, an attorney is obligated under Federal Rule of Civil Procedure 11 to ensure everything in that form applies to the case at hand. Similar reasoning applies to interrogatories.

The defendants also object to the February 5, 1999, item "Filing of Complaint and Petition at Courthouse and Travel" assessed for 1.5 hours. Given that the plaintiff's attorney's office is some 18 miles from the courthouse, this is a reasonable amount of time spent.

■ Finally, the defendants object to the October 14, 1999, item, "Preparation of Plaintiffs' Motion for Summary Judgment, brief, Notice of Hearing and Proof of Service, Research" assessed at 5.10 hours. The defendants argue that such an item was not contemplated as reimbursable for attorney's fees. But, of course, summary judgment is a favored method for resolving an issue. Indeed, it takes far less time. There is no reason to treat time spent preparing for a summary judgment motion any differently than time spent in trial preparation. Thus, I reject the defendants' objections and award attorney's fees in the amount requested, $22,911.55.

## VIII. Conclusion

I sustain the $3,000 compensatory damages award and direct the plaintiffs to indicate their acceptance of the remitittur

---

6. Defendants argue that attorney fees should not be awarded because Plaintiffs' attorney worked on a contingency basis, relying on *Samuel v. Benedict*, 573 F.2d 580 (9th Cir. 1978). In *Samuel*, the court held that attorney's fees were not available under the Fair Housing Act where the attorney worked on a contingency basis. But, writing in 1978, it did so under a prior version of the Fair Housing Act that awarded attorney's fees for a prevailing plaintiff "provided, (t)hat the said

plaintiff... is not financially able to assume said attorney's fees." *Id.* (quoting 42 U.S.C. § 3612(c)). In 1988, Congress removed the provision restricting recovery of attorney's fees to those unable to assume them, Pub.L. 100–430 § 8(2); no such language occurs in the current statute. See 42 U.S.C. § 3612(p) (West 1994 and Supp.1999) ("[T]he court... may allow the prevailing party... a reasonable attorney's fee and costs")

amount of $30,000 in punitive damages within thirty days of the entry of this order. If the plaintiffs do not accept this amount, I will order a new trial on the issue of damages.

Additionally, I award plaintiffs $22,911.55 in attorney's fees as the prevailing parties, such award to take effect even if the plaintiffs reject the remitittur amount.

IT IS SO ORDERED.