**Rollin Scott SCHALL, Plaintiff,**

v.

**Joseph A. VAZQUEZ, Defendant.**

No. Civ.A.04–00743.

United States District Court,
E.D. Pennsylvania.

June 16, 2004.

Richard L. Orloski, Orloski, Hinga, Pan-
daleon & Orloski, Allentown, PA, for Plain-
tiff.

Louis J. Petriello, Petriello and Royal,
LLP, Blue Bell, PA, for Defendant.

### FINDINGS OF FACT AND
### CONCLUSIONS OF
### LAW

KATZ, District Judge.

Plaintiff Rollin Scott Schall ("Schall")
brings claims under 42 U.S.C. Section 1983
against Corporal Joseph A. Vazquez
("Vazquez") of the Pennsylvania State Po-
lice for violations of his Fourth and Four-
teenth Amendment rights, alleging that he
was illegally seized and subject to exces-
sive force by Vazquez. Schall is seeking
compensatory and punitive damages from
Vazquez. In addition, Schall seeks dam-
ages based on supplemental Pennsylvania
law claims. After a bench trial, the court
makes the following findings of fact and
conclusions of law:

## I. FINDINGS OF FACT

1. Schall is an individual employed as a
civilian maintenance worker with Pennsyl-
vania State Police Troop M Bethlehem
Barracks in Bethlehem, Pennsylvania.
Schall has been employed in that capacity
since December 1991.

2. Vazquez has been employed as an offi-
cer with the Pennsylvania State Police for
approximately 24 years and was assigned
to Troop M Bethlehem Barracks on Sep-
tember 1, 1983.

3. Schall and Vazquez worked together at
the Bethlehem Barracks for approximately
12 years. They had developed a friendly
relationship at work that included "horse-
play" such as verbal taunts, throwing food
at each other, and pushing or shoving each
other.

4. Schall and Vazquez both consented to
this type of horseplay behavior prior to
January 31, 2003. The horseplay prior to
this date never involved a firearm.

5. On Friday, January 31, 2003, Schall
and Vazquez were both on duty at the
Bethlehem barracks.

6. Between 12 and 1 p.m. on January 31,
2003, Schall was sitting in the barracks
lunchroom. Several other State Police
employees were present, including Roger

Andras, Tina Koren, Trooper Paul Iannace, and Trooper Christopher Sullivan.

7.  Vazquez entered the lunchroom sometime between 12 and 1 p.m. with a plate of cupcakes, which he set down on a table. Schall spoke to Vazquez, commenting on Vazquez's weight and telling him he should eat a cupcake.

8.  Vazquez responded with a similar comment about Schall and left the lunchroom to hang up his coat. Less than a minute later, he returned to the lunchroom and spoke with Schall again.

9.  After conversing with Schall for several minutes, Vazquez grabbed Schall near the top of his head using his left arm. With Schall's face pressed against Vazquez's chest in a headlock-type hold, Vazquez removed his service revolver with his right hand and held it against Schall's head. This event was not preceded by physical horseplay on this day.

10. Schall could not see the exact position of Vazquez's service revolver because his face was turned towards Vazquez's chest.

11. Vazquez pointed the loaded gun at Schall's head for a few seconds.

12. After a few seconds, Vazquez placed his weapon back in its holster and released Schall from the headlock hold.

13. Schall did not resist Vazquez's physical force while being held in the headlock.

14. Schall did not believe he was free to go until Vazquez reholstered his weapon and released him from the headlock hold.

15. After Vazquez released him, Schall walked out of the lunchroom.

16. On Monday, February 3, 2003, Vazquez's superiors told him that there would be an internal investigation into the January 31, 2003 incident.

17. After the January 31, 2003 incident and the subsequent internal affairs investigation, Vazquez received a six-week sus-pension from the State Police without pay as a result of an internal arbitration.

18. Vazquez was transferred to another location within the State Police system.

19. Schall continues to work as a maintenance worker at the Bethlehem barracks.

20. The January 31, 2003 incident frightened, humiliated, and shocked Schall. He missed five days of work due to stress from the incident and attended several counseling sessions with respect to the incident. Schall continues to feel anxiety when remembering the incident and worries about being around other co-workers who routinely carry guns at the Bethlehem barracks. Schall's satisfaction with his work environment has decreased as a result of the January 31, 2003 incident because of anxiety and the strain that the administrative aftermath has put on his relationships with co-workers. This anxiety has led to difficulty sleeping.

21. Schall suffered no physical injuries as a result of the January 31, 2003 incident and has never taken any medication for anything associated with the incident.

## II. *CONCLUSIONS OF LAW*

1.  This court has federal question jurisdiction over Schall's civil rights claims pursuant to 28 U.S.C. Section 1331 and supplemental jurisdiction over his state law claims pursuant to 28 U.S.C. Section 1367.

2.  To establish a cause of action for civil rights violations under Section 1983, a plaintiff must show that the defendant acted under color of law and that the defendant's actions deprived plaintiff of a constitutionally or federally secured right, privilege, or immunity. *See* 42 U.S.C. § 1983; *Kost v. Kozakiewicz,* 1 F.3d 176, 184 (3d Cir.1993).

3.  Vazquez admits that he acted under color of law at the time of the January 31,

2003 incident because he was on duty as a Pennsylvania State Trooper, used a weapon owned by the Commonwealth of Pennsylvania that he lawfully possessed, and the incident took place at the Pennsylvania State Police Barracks.

A. *Deprivation of Constitutional Right to be Free from Unreasonable Seizures*

■ 1. Under the Fourth Amendment, which applies to state action via the Due Process Clause of the Fourteenth Amendment, every person has a right to be secure in their person against unreasonable searches and seizures. *See* U.S. Const. amend. IV; *Mapp v. Ohio*, 367 U.S. 643, 646–53, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (holding that states are bound by the same Fourth Amendment principles as the federal government).

■ 2. The seizure of a person for purposes of the Fourth Amendment occurs when "taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Kaupp v. Texas*, 538 U.S. 626, 629, 123 S.Ct. 1843, 155 L.Ed.2d 814 (2003) (internal citations omitted). *See also California v. Hodari D.*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991) (holding that a suspect is not seized for Fourth Amendment purposes when he flees in response to a show of authority because the "reasonable person" test is necessary but not sufficient to identifying a seizure).

■ 3. Vazquez's conduct towards Schall constituted a seizure because Schall reasonably believed that he was not free to leave while Vazquez was exercising control over his body by grabbing him, unholstering his weapon, and placing it near Schall's head. Schall submitted to Vazquez's physical force and show of authority.

■ 4. Regardless of whether Vazquez pointed his weapon at Schall's head or held it near Schall's head while Schall was being held in a headlock, a law enforcement officer unholstering a loaded weapon while holding someone in a headlock is sufficient to make a reasonable person in that position believe that he or she is not free to leave. *See Terry v. Ohio*, 392 U.S. 1, 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ("It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person."). Courts have treated even brief investigatory stops as seizures under the Fourth Amendment, subject to at least the "reasonable suspicion" standard outlined in *Terry v. Ohio. See, e.g., United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002).

■ 5. Although the Fourth Amendment does not define "unreasonable," courts have held that a seizure is unreasonable if the invasion that the seizure entails outweighs the need for the seizure. *See Camara v. Municipal Court*, 387 U.S. 523, 534–37, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); *United States v. Montoya de Hernandez*, 473 U.S. 531, 537, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985) (holding that reasonableness depends on the nature of the seizure, the surrounding circumstances, and balance of individual's Fourth Amendment rights with legitimate government interests) (citing, *inter alia, New Jersey v. T.L.O*, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) and *United States v. Villamonte–Marquez*, 462 U.S. 579, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983)). *See also United States v. Pollard*, 326 F.3d 397, 410–11 (3d Cir.2003) ("For the most part, searches and seizures undertaken without a warrant and probable cause or

reasonable suspicion are unreasonable and violative of the Fourth Amendment.").

6. The Supreme Court has recognized several exceptions to the general rule that probable cause is required for a reasonable seizure or an arrest, such as a limited seizure when an officer has reasonable suspicion of illegal activity. *See Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (upholding the admission of evidence obtained from the seizure and subsequent "pat down" of a suspect based on a police officer's reasonable suspicion that the suspect had a gun).

7. Vazquez had neither probable cause to seize Schall nor reasonable suspicion that Schall was engaged in any criminal activity at the time he was seized.

8. Vazquez's seizure of Schall was therefore unreasonable and violated Schall's Fourth Amendment rights.

### B. *Deprivation of Constitutional Right to be Free of Excessive Force*

■ 1. The Third Circuit has held that to state a claim for excessive force under the Fourth Amendment, "a plaintiff must show that a 'seizure' occurred and that it was unreasonable." *Abraham v. Raso*, 183 F.3d 279, 288 (1999) (quoting *Brower v. County of Inyo*, 489 U.S. 593, 599, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989)). A claim for excessive force is "properly analyzed under the Fourth Amendment's 'objective reasonableness' standard, rather than under a substantive due process standard." *Graham v. Connor*, 490 U.S. 386, 388, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). *See also Tennessee v. Garner*, 471 U.S. 1, 8–9, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) (noting that several Supreme Court cases dealing with reasonableness under the Fourth Amendment framed the issue as "whether the totality of the circumstances justified a particular sort of search or seizure.").

■ 2. Vazquez's actions on January 31, 2003 constituted a seizure of Schall; therefore, the court should consider Schall's claim that Vazquez carried out that seizure in an objectively unreasonable manner.

3. Vazquez effectuated the seizure of Schall by placing him in a headlock while he drew his loaded service revolver from its holster and held it near Schall's head for several seconds before releasing him.

■ 4. Pointing a loaded gun at another person is a display of deadly force because it creates more than a remote possibility of death. *See* Model Penal Code § 3.11(2) (1994) (defining "deadly force" as "force which the actor uses with the purpose of causing or which he knows to create a substantial risk of causing death or serious bodily harm.") (cited in *In re City of Philadelphia Litigation*, 49 F.3d 945 (3d Cir.1995) and *Matthews v. Jones*, 35 F.3d 1046, 1050–51 (6th Cir.1994)). An officer's actions need not actually wound or kill a person to be considered a display of deadly force. *See Ryder v. City of Topeka*, 814 F.2d 1412, 1416 n. 11 (10th Cir. 1987).

5. Vazquez used deadly force when he put Schall in a headlock and drew his loaded service weapon close to Schall's head. Defendant Vazquez admits that he used deadly force on January 31, 2003 in his deposition. *See* Def.'s Dep. at 60, lines 8–13.

■ 6. According to the Supreme Court, deadly force is only reasonable when "it is necessary to prevent the escape [of a suspect] and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Tennessee v. Garner*, 471 U.S. 1, 3, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). The Third Circuit, drawing on *Garner* and *Graham v.*

*Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), set forth the following standard for analyzing whether the use of deadly force was reasonable under the Fourth Amendment:

> Giving due regard to the pressures faced by the police, was it objectively reasonable for the officer to believe, in light of the totality of the circumstances, that deadly force was necessary to prevent the suspect's escape, and that the suspect posed a significant threat of death or serious physical injury to the officer or others? . . . . The factors to consider include the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."

*Abraham v. Raso,* 183 F.3d 279, 288–96 (1999) (citing *Graham* at 396, 109 S.Ct. 1865).

7. It was unreasonable for Vazquez to use a display of deadly force because Schall was not resisting or trying to escape the seizure, posed no threat of physical harm to Vazquez or others, and Schall had committed no crime. Vazquez acknowledges he should not have unholstered his weapon.

8. Considering the totality of the circumstances, the nature of the seizure and the lack of a justification for the seizure, the court finds that Vazquez used excessive force in his seizure of Schall and violated Schall's Fourth Amendment rights.

### C. *Claim for Civil Battery*

█ 1. To establish a claim for the intentional tort of battery, a plaintiff must show that the defendant made a harmful or offensive contact with a person and that the contact resulted from an act intended to cause the plaintiff or a third person to suffer such a contact or intended to cause an apprehension of such imminent contact. *See Herr v. Booten,* 398 Pa.Super. 166, 580 A.2d 1115, 1117 (1990) (quoting Prosser & Keeton, *Law of Torts* at 39 (5th ed.1984)); *Lakits v. Joseph York,* 258 F.Supp.2d 401, 407 (E.D.Pa.2003).

█ 2. According to the *Restatement (Second) of Torts,* "[A] bodily contact is offensive if it offends a reasonable sense of personal dignity." *Herr* at 1117 (quoting *Restatement* § 19). *See also Montgomery v. Bazaz–Sehgal,* 742 A.2d 1125, 1130 (Pa.Super.1999) (finding that there is no need to show actual physical injury in order to establish battery if there has been an offensive contact without consent).

3. Vazquez's action towards Schall on January 31, 2003 constituted harmful and offensive contact. In bringing his loaded weapon up near Schall's head while holding him in a headlock, Vazquez made physical contact with Schall and put him at risk of bodily harm. In addition, making such contact in the lunchroom in front of co-workers was offensive in that it was an affront to Schall's sense of personal dignity and an embarrassing physical display. Vazquez acted with the intention to cause such contact because he purposely grabbed Schall and placed him in a headlock.

█ 4. To make out a case for the intentional tort of battery, the plaintiff must also prove that he did not consent to the tortious conduct because consent destroys the wrongfulness of the conduct between the parties. *See Levenson v. Souser,* 384 Pa.Super. 132, 557 A.2d 1081, 1088 (1989); *Restatement (Second) Torts* § 892A ("One who effectively consents to the conduct of another intended to invade his interests cannot recover in an action of tort for the conduct or for the harm resulting from it.").

5. According to the Third Circuit, "Express consent to harmful or offensive

touching may be given by words or affirmative conduct and implied consent may be manifested when a person takes no action, indicating an apparent willingness for the conduct to occur." *Barnes v. American Tobacco Co.*, 161 F.3d 127, 148 (3d Cir.1998) (citing *Restatement (Second) Torts* § 892 cmt. b & c). The consent must be to the defendant's conduct rather than to its consequences. *See Barnes* at 148 (citing Prosser & Keeton § 18, at 118).

6. Schall did not give express or implied consent to Vazquez's physical conduct on January 31, 2003. Although the two men had engaged in over a decade of "horseplay" at work that occasionally involved pushing, shoving, or throwing food at each other, the incident on January 31, 2003 was a significant departure from the types of interactions that they had in the past because it involved a serious risk of physical harm due to the use of a loaded weapon. Even if Schall had consented to continuing their regular horseplay on that day through inaction, this cannot be construed as implied consent to an escalation of the degree of their physical horseplay. *See Barnes* at 148 ("A plaintiff's consent is not effective if 'the consenting person was mistaken about the nature and quality of the invasion intended by the conduct.'" (citing Prosser & Keeton § 18, at 114)). Furthermore, Schall had no opportunity to give express intent to being put in a headlock and exposed to an unholstered loaded weapon because Vazquez grabbed him without warning and the entire incident was over in a matter of seconds.

### D. Damages

1. To recover compensatory damages, a plaintiff in a civil rights action under 42 U.S.C. § 1983 need not prove physical injuries. *See Hector v. Watt*, 235 F.3d 154, 157 (3d Cir.2000) ("Victims of unreasonable searches or seizures may re-

cover damages directly related to the invasion of their privacy—including (where appropriate), damages for physical injury, property damage, injury to reputation, etc.") (internal citation omitted); *Niehus v. Liberio*, 973 F.2d 526, 528 (7th Cir.1992) (sustaining large award of compensatory damages to victim of arresting officers' excessive force in light of expert testimony as to psychological injury); *Bogle v. McClure*, 332 F.3d 1347, 1359 (11th Cir. 2003) (upholding award of damages for emotional harm caused to victim of race discrimination).

2. A plaintiff may recover compensatory damages on a claim for civil battery based on physical injuries as well as emotional injuries such as feelings of shock, fright, or humiliation.

3. Schall is entitled to compensatory damages because the incident scared and humiliated him and continues to reduce his quality of life both at home and at work in that his anxiety interferes with his sleeping and he is not as happy as he used to be at work.

4. A plaintiff party may recover punitive damages in a Section 1983 case if the defendant's actions were committed with "malice or reckless indifference to the federally protected rights of an aggrieved individual." *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999). In *Kolstad*, the Supreme Court held that a defendant's state of mind and not the egregious conduct is determinative in awarding punitive damages in a civil rights case. *See id. See also Smith v. Wade*, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983) (holding that a jury may assess punitive damages in a § 1983 case where the defendant's conduct is motivated by evil motive or intent or involves reckless or callous indifference to others' civil rights).

4. The court finds that Schall is entitled to punitive damages because Vazquez acted with reckless indifference towards Schall in that he intentionally placed Schall in a position where he was at risk of death or serious injury due to proximity of the loaded gun to Schall's head. Vazquez admitted that he should not have unholstered his weapon and the court finds that his doing so was reckless with regard to Schall's safety and personal dignity.

5. An award of punitive damages in this case would deter Vazquez and others from engaging in similar conduct in the future and underscore to the law enforcement community the seriousness with which firearm activity must be taken. *See Memphis v. Stachura*, 477 U.S. 299, 306 n. 9, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986) ("The purpose of punitive damages is to punish the defendant for his willful or malicious conduct and to deter others from similar behavior.").

### JUDGMENT

**AND NOW**, this 16th day of June, 2004, judgment is entered on the claims in **FAVOR** of the plaintiff, Rollin Scott Schall and **AGAINST** the defendant, Joseph A. Vazquez, in the amount of $5,000 in compensatory damages and $10,000 in punitive damages.